RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES EARL SLAUGHTER,

> *Petitioner-Appellee/*
> *Cross-Appellant,*

Nos. 01-6359/6462

*v.*

PHIL PARKER, Warden,

> *Respondent-Appellant/*
> *Cross-Appellee.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 00-00227—Jennifer B. Coffman, District Judge.

Argued: October 26, 2005

Decided and Filed: June 13, 2006

Before: BOGGS, Chief Judge; BATCHELDER and COLE, Circuit Judges.

---

## COUNSEL

**ARGUED:** David A. Smith, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Kathleen K. Schmidt, PIKE & SCHMIDT, Sheperdsville, Kentucky, for Appellee. **ON BRIEF:** Tami R.A. Stetler, Brian T. Judy, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant. Kathleen K. Schmidt, PIKE & SCHMIDT, Sheperdsville, Kentucky, Marguerite Neill Thomas, DEPARTMENT OF PUBLIC ADVOCACY, Frankfort, Kentucky, Rodney McDaniel, Frankfort, Kentucky, for Appellee.

BATCHELDER, J., delivered the opinion of the court, in which BOGGS, C. J., joined. COLE, J. (pp. 14-23), delivered a separate dissenting opinion.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. Respondent Phil Parker, a warden, appeals the district court's order granting James E. Slaughter, a.k.a. Jeffrey Leonard, a writ of habeas corpus on grounds of ineffective assistance of trial counsel. Slaughter, in turn, appeals the district court's denial of habeas relief on all other grounds asserted by Slaughter. For reasons explained below, we REVERSE the district court's grant of relief on the basis of ineffective assistance of counsel and we AFFIRM the district court's denial of relief on all other grounds.

1

1.      *History of the case*

        A.      *Conviction and appeal*

        The charges underlying Slaughter's convictions arose from the January 28, 1983, murder of Esther Stewart, a Kentucky resident who was stabbed to death at the "The Clothes Rack," a consignment store that she owned and operated. Slaughter was arrested the day after the crime. His trial began on October 24, 1983, and the jury found Slaughter guilty of capital murder and robbery in the first degree. *Slaughter v. Commonwealth of Kentucky*, 744 S.W.2d 407, 409 (Ky. 1988).

        Slaughter's counsel called two witnesses to testify at the penalty phase of the trial: Slaughter and a state psychologist. Slaughter testified that his father died in 1972 while serving a prison sentence, and that he ran away from home at a young age to escape his physically abusive mother. *Slaughter v. Parker*, 187 F.Supp. 2d 755, 772 (W.D. Ky. 2001). He also testified, incorrectly, that his mother had died of cancer in 1980. Slaughter confessed to being a thief but blamed Stewart's murder on a man named "Red," a white male hitchhiker Slaughter claimed to have picked up prior to the robbery. According to Slaughter, before entering the Clothes Rack, he and Red agreed to exchange clothes. Shortly after Red entered the store, Slaughter heard a blood-curdling cry come from within the building. After Red emerged, he and Slaughter again switched clothes. Slaughter dropped Red off at an arcade and, although Red was never found, Slaughter was apprehended the next day. In summary, during the penalty phase of his trial, Slaughter refused to accept responsibility for the murder.

        Dr. Phillip Johnson, a clinical psychologist employed by the Kentucky Correctional Psychiatric Center, also testified for Slaughter during the penalty phase. The court had retained Dr. Johnson to determine Slaughter's competency to stand trial, and on August 26, 1983, he filed a report concluding that Slaughter was, in fact, competent to stand trial. Based on his examination of Slaughter, Dr. Johnson testified that Slaughter suffers from a "border line personality disorder with anti-social traits." According to Dr. Johnson, people with this disorder experience problems with their families, peers and occupations, and often struggle in school. He described Slaughter's problems as "moderate to severe across virtually every dimension" of life. Dr. Johnson opined that, if left to his own devices, Slaughter would not become a productive member of society. However, Dr. Johnson also stated that Slaughter would do better in highly structured situations, such as prison. While he could not guarantee that Slaughter would benefit from a treatment program, Dr. Johnson opined that rehabilitation was possible if Slaughter made a sincere effort to change his ways. Dr. Johnson also testified that Slaughter abused alcohol, amphetamines, hallucinogenic drugs, and marijuana. Because Slaughter's defense counsel never petitioned the court to appoint an independent expert, Dr. Johnson was the only expert witness to testify during the penalty phase.

        Following closing arguments, the jury sentenced Slaughter to death for murder. Slaughter took a direct appeal to the Supreme Court of Kentucky, which rejected all of his arguments and affirmed his conviction and sentence. *See Slaughter v. Commonwealth*, 744 S.W.2d 407 (Ky. 1987). The United States Supreme Court denied certiorari on June 12, 1989. *See Slaughter v. Kentucky*, 490 U.S. 1113 (1989).

        B.      *Post-Conviction Proceedings*

        On October 13, 1989, Slaughter filed an RCr 11.42 motion to vacate, set aside or correct the judgment of conviction. The trial court held a three-day evidentiary hearing in September of 1994. Ferdinand Radolovich, Slaughter's defense attorney, was the first witness to testify. Radolovich testified that he had handled four capital trials when he was with the District Attorney's Office in

New York.[1]  Radolovich also testified that he spent over 99% of the time that he devoted to Slaughter's case on the guilt phase of the trial and spent very little time preparing Slaughter for the penalty phase.

Radolovich testified that Slaughter had told him that he had no family, save his elderly aunt in Alabama.  Relying on this information, Radolovich made no effort to research his client's family background.  Radolovich contacted the aunt but did not ask her whether Slaughter had any surviving family members.  Radolovich also contacted a number of Slaughter's friends and associates, none of whom had anything positive to say about Slaughter.  Radolovich admitted to making no effort to pursue Slaughter's birth, school, or medical records.

Mary Moon, Slaughter's mother, also testified at the hearing.  Moon stated that Slaughter had a turbulent childhood; that because Moon worked a lot, Slaughter frequently had to care for his younger siblings; and that both she and her husband beat Slaughter and his brothers.  Moon also testified that Slaughter was very close to his late grandmother, whom he called once a week.  Finally,  Moon suggested that Slaughter lied about the death of his family members to protect his grandmother.

Bobby and Vincent Moon, Slaughter's half-brothers, also testified.  Bobby corroborated his mother's testimony and stated that Slaughter took care of him when Bobby was younger.  Vincent testified that Slaughter once rushed him to the hospital when he was injured and would often sneak food to him when their mother confined the children to their room with nothing to eat.  Slaughter's mother testified that he once fled from the house carrying his younger brother, Bobby, while his stepfather tried to shoot them.  Slaughter's grandparents, Charlie Dean Leonard and Clara Leonard also testified at the hearing.  All of Slaughter's relatives stated that they did not want him to be executed.

After the testimony of Slaughter's relatives, defense counsel called a series of experts to testify, beginning with Dr. Eric Engum, a clinical psychologist who examined Slaughter in 1994.  Dr. Engum diagnosed Slaughter as having Attention Deficit Disorder ("ADD") and a learning disability that would make it difficult for Slaughter to understand complex legal concepts.  Dr. Engum concluded that Slaughter could be rehabilitated and could respond positively to therapy.  Dr. Gary Carl, a physician who specializes in treating abused and neglected children, testified that scars on Slaughter's body suggested that he had been beaten as a child.  Dr. Vivian Spears, a psychologist,  testified that Slaughter had received a poor education as a result of his ADD and that he would likely perform better in a structured environment.  Lane Veltkamp, a licensed clinical social worker, testified that although Slaughter distrusted others and had a great deal of anger, these problems could be overcome by therapy.  Dr. Delbert Drogin, a clinical psychologist and practicing attorney, testified that Dr. Johnson did an inadequate job evaluating Slaughter.  While Dr. Drogin was unable to endorse Dr. Johnson's conclusions, he could not say that they were incorrect.

The final witness to testify at the hearing was Bette Niemi, an attorney who had tried numerous capital cases.   She testified that Radolovich rendered constitutionally ineffective assistance of counsel for a great number of reasons, including his failure to ask for an independent medical expert to testify during the penalty phase.  She opined that an attorney should begin preparing for the penalty phase on the day that he gets assigned a capital case and that a competent attorney would begin this process by requesting the defendant's school, medical, and birth records.  If an attorney learns that a client has supplied him with a false name, that attorney should perform

---

[1]Radolovich's testimony about his background was false.  The Executive District Attorney in New York County submitted an affidavit that revealed that Radolovich had worked for the office for less than a year and did not try any capital cases.  Radolovich has subsequently been indicted for perjury in connection with the statements that he made at the hearing.

an investigation into the client's real name. Niemi testified that there was material available that would have tipped Radolovich off that Slaughter's real name is Leonard. Niemi stated that it is inappropriate for a defense attorney to rely on a KCPC report for the mitigation phase because KCPC reports are not confidential and are distributed to the prosecution.

Despite the extensive proofs presented during the RCr 11.42 hearing, on June 22, 1995, the Jefferson Circuit Court overruled Slaughter's motion. The court concluded that Radolovich provided constitutionally effective assistance of counsel as judged by 1983 standards and also concluded that the new mitigating evidence would not have changed the jury's sentence. Slaughter appealed to the Supreme Court of Kentucky, which affirmed the ruling of the trial court in an unpublished opinion dated April 22, 1999. Applying the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), the court held that it was reasonable for Radolovich not to investigate Slaughter's background in light of Slaughter's false representations. The court also held that Radolovich's failure to request an independent mental health expert did not render his counsel constitutionally ineffective and, in any event, Slaughter was not prejudiced. The United States Supreme Court denied certiorari on February 28, 2000. *Slaughter v. Kentucky*, 528 U.S. 1192 (2000).

### C.       *Federal Habeas Proceedings*

On April 20, 2000, Slaughter petitioned for a writ of habeas corpus. The United States District Court for the Western District of Kentucky granted relief on grounds of ineffective assistance of trial counsel, *Slaughter v. Parker*, 187 F.Supp. 2d 755 (W.D. Ky. 2001), finding that Radolovich had provided ineffective assistance during the penalty phase of the trial due to his failure to: 1) adequately prepare and investigate Slaughter's family background and social history, and 2) request an independent mental health expert to testify. The district court granted Slaughter a new penalty phase trial and the Commonwealth appealed.

The district court granted Slaughter a Certificate of Appealability on four issues: whether 1) the trial court erred by not instructing the jury on the lesser included offenses of wanton murder and second degree manslaughter; 2) the trial court abridged Slaughter's due process rights by not including the absence of extreme emotional distress in its murder instruction; 3) the jury was misled to believe that they must find mitigating factors unanimously; and 4) the trial court impermissibly allowed a juror to question Slaughter during the penalty phase. We expanded the Certificate of Appealability to include two additional issues: whether the trial court erred by 1) instructing the jurors at the penalty phase that they would merely "recommend" a sentence of death and 2) submitting to the jury a verdict form that was unconstitutional because it required the listing of aggravating factors but did not contain a parallel requirement for listing the mitigating factors. We address each issue in turn.

Because Slaughter filed his habeas petition in April 2000, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (AEDPA applies to petitions filed after April 24, 1996). Title 28 U.S.C. § 2254 sets out the requirements for a grant of habeas relief:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

"A state court decision is 'contrary to' clearly established Federal law if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a different result." *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (internal quotations omitted). Furthermore, the statute "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final." *Williams v. Taylor*, 529 U.S. 362, 380 (2000).

We may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. "A federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Bell v. Cone*, 535 U.S. 685, 694 (2002). In the absence of a state court decision on the federal constitutional case in question, the court of appeals conducts a review to determine whether the state court decision is contrary to Supreme Court jurisprudence. *Clifford v. Chandler*, 333 F.3d 724, 730 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).

When reviewing a district court's decision to grant a writ of habeas corpus, we review *de novo* the court's legal conclusions and its factual findings for clear error. *Smith v. Hofbauer*, 367 F.3d 809, 813 (6th Cir. 2002). We give complete deference to evidence-supported state court findings of fact. *See Sumner v. Mata*, 455 U.S. 591, 597 (1982).

2.     *Ineffective assistance of counsel*

The district court granted Slaughter relief based on constitutionally ineffective assistance during the penalty phase of the trial. Specifically, the district court found that Radolovich's investigation into mitigation for purposes of the penalty phase was insufficient. To establish ineffective assistance of counsel, Slaughter must show that 1) his counsel rendered deficient performance and 2) this deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under AEDPA, we will only overturn a state appellate court's ruling on ineffective assistance of counsel if it is an unreasonable application of *Strickland*. *Bell*, 535 U.S. at 693-94. When analyzing an ineffective assistance of counsel claim on habeas review, we consider both the evidence adduced at trial and the evidence adduced in the habeas proceeding. *Towns v. Smith*, 395 F.3d 251, 257 (6th Cir. 2005).

Slaughter claims that two omissions render Radolovich's assistance ineffective. First, Slaughter argues that Radolovich should have investigated whether Slaughter had any family members other than his aunt. Second, Slaughter faults Radolovich's decision not to research his birth, school, and medical records.

We consider first whether the Supreme Court of Kentucky's decision that Radolovich performed an adequate investigation in preparation for the penalty phase was reasonable. In determining whether counsel rendered ineffective assistance, we measure counsel's performance by standards prevailing at the time of Slaughter's trial. *See Strickland*, 466 U.S. at 690. A court's scrutiny of counsel's performance is highly deferential. *Id*. at 691. "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. This court has held that *Strickland's* "reasonableness" standard "includes counsel's duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary." *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003) (internal quotation omitted). *Strickland* held that,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Slaughter urges us to look to the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003) for guidance in how to apply *Strickland*.[2] The *Wiggins* Court held that a state court's determination that counsel's performance was constitutionally effective was unreasonable because counsel's failure to investigate "resulted from inattention, not reasoned strategic judgment." *Id*. at 526. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id*. at 527.

We agree with the district court that Radolovich's performance was deficient. Evidence adduced at the RCr 11.42 hearing demonstrates that a competent attorney would not have relied on the state's background report as Radolovich did, and that Radolovich spent an insufficient amount of time preparing for the penalty phase of Slaughter's trial. Radolovich made no effort to research Slaughter's family background. By his own account, he failed to ask Slaughter's aunt whether she knew of any other family members who might be willing to testify on Slaughter's behalf. Moreover, Radolovich made no effort to pursue Slaughter's birth, school or medical records. He made no effort to obtain an independent psychological evaluation of Slaughter.[3] We see no evidence that Radolovich made a reasonable decision that would have rendered such investigations unnecessary, and we find that his failure to research Slaughter's history "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. We therefore conclude that Slaughter has satisfied the first prong of the *Strickland* test.

In order to establish ineffective assistance of counsel, Slaughter must also show that Radolovich's deficient performance prejudiced him by rendering the trial unfair and its result unreliable. *Strickland*, 466 U.S. at 687. To do so, Slaughter "must show that there is a reasonable

---

[2]At first blush Slaughter's argument seems problematic because *Wiggins* was published after his conviction became final. *See Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (new rules of criminal procedure generally do not apply retroactively to cases already final on direct appeal). A careful reading of *Wiggins*, however, reveals that the Court looked to *Strickland* while analyzing whether trial counsel performed an adequate investigation in preparing for the penalty phase of Wiggins's trial, which occurred in October of 1989. *See Hamblin*, 354 F.3d at 487 ("[t]he Court in *Wiggins* clearly holds . . . that it is not making 'new law' on the ineffective assistance of counsel either in *Wiggins* or in the earlier case on which it relied for its standards, *Williams v. Taylor* []"). Hence, we may look to *Wiggins* to decide whether the Supreme Court of Kentucky unreasonably applied Supreme Court precedent.

[3]During oral argument, the warden asserted that, at the time of Slaughter's trial, Kentucky law provided for a defendant's evaluation at a private mental health facility only under "extraordinary circumstances." The warden did not supply us with any authority for this assertion, and we have found none. It appears to us that the trial judge could have granted an independent examination if it were "reasonably necessary." *See Hicks v. Commonwealth*, 670 S.W.2d 837, 838 (Ky. 1984).

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. When the defendant alleges that counsel provided ineffective assistance during the penalty phase of a capital trial, the question is whether there is a "reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695. On the other hand, there is an insufficient showing of prejudice where "one is left with pure speculation on whether the outcome of the trial or the penalty phase could have been any different." *Baze v. Parker*, 371 F.3d 310, 322 (6th Cir. 2004).

We do not find it reasonably probable that the outcome of Slaughter's sentencing would have been different if Radolovich had unearthed the testimony presented at the RCr 11.42 hearing. Had Radolovich located Slaughter's family, the jury would have heard testimony from Slaughter's mother, brothers, and grandparents that Slaughter was abandoned by his father, abused by his mother and step-father, and frequently left in charge of his siblings. The jury heard such testimony from Slaughter himself. Accordingly, we are not convinced that the additional testimony of Slaughter's family members would have influenced the jury's decision. Although the jury would also have witnessed Slaughter's family members ask the jury to spare his life, we are "left with pure speculation" as to the effect those requests might have had on the trial's outcome. *Baze*, 371 F.3d at 322.

Similarly, the failure to research his birth, health and school records did not prejudice Slaughter. After we heard oral argument in this appeal, Slaughter moved to supplement the record with various of these documents, and, although we deny the motion, *see Bradshaw v. Richey*, 126 S. Ct. 602, 605 (2005), out of an abundance of caution we have reviewed the proffered documents. *See also Holland v. Jackson,* 542 U.S. 649, 652-53 (2004). We conclude that Slaughter has not established prejudice resulting from their absence at trial. Because Slaughter's expert witnesses testified that he never received medical care for his injuries, we find it likely that a search of his medical records would not have been productive. A review of Slaughter's school records would have informed the jury that he was a poor student, a fact that jurors would not have found helpful. Finally, we could make the charitable assumption that a review of Slaughter's records would have led Radolovich to Slaughter's family, but for the reasons already stated, this assumption would not establish prejudice.

Finally, it is not reasonably probable that Radolovich's failure to obtain an independent psychological examination resulted in prejudice. Expert psychological testimony presented at the RCr 11.42 hearing was largely the same as Dr. Johnson's testimony at trial. Dr. Johnson testified that Slaughter suffered from ADD, had an anti-social personality and would benefit from a highly-structured environment, such as prison. At the RCr 11.42 hearing, experts testified that Slaughter had ADD, would benefit from a structured environment, distrusted others and had a great deal of anger. We conclude that the addition of such testimony would not have affected the outcome of Slaughter's trial and therefore, Slaughter has not shown prejudice resulting from his trial counsel's deficient performance. We therefore hold that the district court erred in finding that Slaughter is entitled to habeas relief on grounds of ineffective assistance of counsel at the penalty phase of his trial.

3. *Juror questioning*

Slaughter argues that he was denied due process when the trial court allowed a juror to question him. Because "it is questionable whether Petitioner fully and fairly presented this issue to the state courts as a matter of federal constitutional law in the first instance," the district court held

that Slaughter defaulted this claim.  After reviewing a copy of Slaughter's direct appeal to the Supreme Court of Kentucky, we agree.

Before seeking federal habeas relief, state prisoners must first exhaust their available state court remedies by fairly presenting all their claims to the state courts. *Whiting v. Burt*, 395 F.3d 602, 612 (6th Cir. 2005).  Ordinarily, the exhaustion requirement is satisfied once the petitioner has fairly presented all his claims to the highest court in the state in which he was convicted, thus giving the state a full and fair opportunity to rule on those claims before the petitioner seeks relief in federal court.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  This can be done by invoking one full round of the state's established procedures.  *Id.*  In reviewing the state court proceedings to determine whether a petitioner has "fairly presented" a claim to the state courts, we have looked to the petitioner's:

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005).  While a petitioner need not cite "chapter and verse" of constitutional law, "general allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (internal citations omitted).

Slaughter's brief to the Supreme Court of Kentucky reproduces the juror's question, argues that it was improper, and concludes "[b]ased on this denial of due process and a fair trial by an impartial jury, appellant is entitled to a new trial."  In support he cites "14th and 6th Amendments. Section 11 of the Kentucky Constitution."  This is the only reference to federal law that Slaughter's brief makes.  The rest of the argument urges only that the trial court did not comply with Kentucky law when it allowed for juror questioning.  The brief relies on a number of state court cases but does not cite a single federal case.  On direct appeal, the Supreme Court of Kentucky denied Slaughter's claim because "[i]t is proper for jurors to ask questions of witnesses so long as they are pertinent and competent." *Slaughter*, 744 S.W.2d at 413 (citing *Miller v. Commonwealth*, 222 S.W. 96 (Ky. 1920)).  The court made no reference to federal law, and did not treat Slaughter's claim as one brought under federal law.

This case is distinguishable from *Dye v. Hofbauer*, in which the Supreme Court reversed our holding that a habeas petitioner had not adequately presented his federal claim to the state court. 126 S. Ct. 5 (2005).  In *Dye*, the Court noted that the petitioner's state court brief not only alleged a violation of due process but also explicitly referenced four federal cases, all of which addressed due process violations.  Slaughter's case is clearly distinguishable.  Unlike the brief at issue in *Dye*, the only reference to federal law in Slaughter's state court brief on this issue is the bare and isolated citation to the Fourteenth and Sixth Amendments.  Accordingly, we conclude that Slaughter has not fairly presented his claim, which is essentially a "general allegation[] of the denial of a right to a 'fair trial.'" *See Blackmon*, 394 F.3d at 400.

Finally, were we to address Slaughter's claim on its merits, we would find it lacking.  It is unlikely that Slaughter was prejudiced by the juror's question, and Slaughter has cited no Supreme Court decision– nor are we aware of any– holding that juror questioning violates the Sixth or the Fourteenth Amendments.

4.      *Jury instructions did not contravene* Beck

Slaughter next argues that the Commonwealth violated his Eighth and Fourteenth Amendment rights by refusing to instruct the jury on the offenses of wanton murder and second degree manslaughter. The Supreme Court of Kentucky denied this claim on the merits. *Slaughter*, 744 S.W.2d at 412-13. In order to receive habeas corpus relief from incorrect jury instructions, Slaughter must show that they were so infirm as to render the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The Supreme Court in *Beck v. Alabama* held that the death penalty may not be constitutionally imposed when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict. 447 U.S. 625, 627 (1980). Both the Supreme Court of Kentucky and the district court held that Slaughter's *Beck* claim failed because the evidence would not support a verdict of wanton murder or second degree manslaughter. We agree.

In *Schad v. Arizona*, the Court held that a petitioner charged with capital murder was not entitled to an instruction on the lesser included offense of robbery because the trial court had also instructed the jury on the lesser included offense of second-degree murder. 501 U.S. 624, 646-48 (1991). *Schad* stated:

> Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all . . . .
>
> We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented . . . . This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with the all-or-nothing choice between the offense of conviction (capital murder) and innocence.

*Id*. at 646-47. In Slaughter's case, the trial court instructed the jury on first-degree robbery as well as intentional murder. As in *Schad*, the jury was not faced with an all-or-nothing choice. Because the jury had the option to convict Slaughter of a lesser, though still violent, crime, we find that *Beck* is not implicated.

Even if we were to apply *Beck*, Slaughter's claim would fail because the evidence would not have supported instructions on wanton murder and second-degree manslaughter. "A person is guilty of wanton murder when . . . he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." *Cook v. Commonwealth of Kentucky*, 129 S.W.3d 351, 362 (Ky. 2004) (quotation omitted). According to the Supreme Court of Kentucky,

> A person acts wantonly *with respect to a result or to a circumstance* described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

*Elliott v. Commonwealth of Kentucky*, 976 S.W.2d 416, 418 (Ky. 1998). "A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person . . . ." K.R.S. 507.040(1).

The Supreme Court of Kentucky's decision denying Slaughter's claim was not contrary to *Beck*. As the district court correctly observed, "[t]he evidence at trial plainly established that the victim was bludgeoned in the head and stabbed five times in the chest, including a stab wound that penetrated five inches into her chest and pierced her heart." *Slaughter*, 187 F.Supp. 2d at 805. These facts foreclose the conclusion that Slaughter acted with any mental state other than intent. *See Campbell v. Coyle*, 260 F.3d 531, 543 (6th Cir. 2001) (state court's denial of instruction on lesser included offense of manslaughter was not objectively unreasonable because the murder victim had sustained five stab wounds). Although Slaughter argues that he merely created a grave risk of death or serious injury by helping Red, the real killer, the record is devoid of evidence to support Slaughter's story. In light of overwhelming evidence of Slaughter's intent, we agree with the ruling of the Supreme Court of Kentucky.

5.        *Jury instructions did not omit an essential element of murder*

Slaughter insists that the Commonwealth failed to prove the absence of extreme emotional disturbance, which he alleges was an essential element of murder on the date of his conviction. The Supreme Court of Kentucky summarily denied this claim as "without merit." *Slaughter*, 744 S.W.2d at 409.

Slaughter's argument sounds in due process. He cites *California Dep't of Corrections v. Morales*, 514 U.S. 499, 504 (1995) in support of the proposition that the *ex post facto* clause prohibits state legislatures from retroactively altering the definition of crimes and then relies on *Bouie v. Columbia*'s rule that the *ex post facto* clause applies to judicial construction as well. 378 U.S. 347, 353-54 (1964) ("If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that the State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction"). According to Slaughter, as of the date that he was convicted, the Supreme Court of Kentucky treated the absence of extreme emotional disturbance as an element of murder, and, therefore, the trial court erred by not requiring the jury to find the absence of extreme emotional disturbance as an element. This argument fails. In Kentucky, a person is guilty of murder when,

> With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

K.R.S. 507.020(1)(a). In 1979, the Supreme Court of Kentucky held "[a] failure to act under the influence of extreme emotional disturbance is an element of the offense of murder, and if the evidence affords any basis upon which the jury could entertain a reasonable doubt as to whether appellant acted under the influence of extreme emotional disturbance, the absence of that element must be enumerated as part of the instruction on murder . . . ." *Edmonds v. Commonwealth of Kentucky*, 586 S.W.2d 24, 27 (Ky. 1979). One year later, the Supreme Court of Kentucky shifted gears and held, "[a]n instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he was, thereby affording room for a reasonable doubt in that respect." *Gall v. Commonwealth of Kentucky.*, 607 S.W.2d 97, 109 (Ky. 1980), *overruled on other grounds in Payne v. Commonwealth of Kentucky*, 623 S.W.2d 867, 870 (Ky. 1981).

While *Gall* did not expressly overrule *Edmonds*, it made perfectly clear that an instruction on murder need not list the absence of extreme emotional disturbance as an element unless there is something in the evidence to suggest that the defendant was, in fact, influenced by extreme

emotional disturbance. "Under [extreme emotional disturbance], mitigation is not restricted to circumstances which would constitute provocation in the ordinary meaning of the term. In other words it is possible for *any event, or even words*, to arouse extreme mental or emotional disturbance . . . . We recognize that there must be some definite, non-speculative evidence to support an [extreme emotional disturbance] instruction." *Holland v. Commonwealth of Kentucky*, 114 S.W.3d 792, 806-07 (Ky. 2003) (internal quotations and citations omitted). To support his claim of extreme emotional disturbance, Slaughter presented only the testimony of two witnesses who reported that Slaughter admitted that his main intention was to rob the Clothes Rack, but that he got scared when the victim started screaming and he stabbed her. This evidence is plainly insufficient. Being "scared" is a far cry from being in a state of "extreme emotional disturbance." Accordingly, an instruction on extreme emotional disturbance was unwarranted. Because the Commonwealth scrupulously complied with its own laws, no due process violation has occurred. Slaughter is not entitled to habeas relief on this ground.

6.       *Jury instructions did not mislead jurors regarding mitigating factors*

Relying on *Mills v. Maryland*, 486 U.S. 367 (1988), Slaughter next contends that the jury instructions impermissibly led members of the jury to believe that they could consider only mitigating factors as to which they agreed unanimously. Slaughter did not raise this challenge on direct appeal before the Supreme Court of Kentucky but instead argued that the instructions failed to require consideration of certain mitigating factors. The trial court instructed Slaughter's jury to "consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true, including but not limited to such of the following," and then included a list of eight mitigating factors.

The Commonwealth argues that Slaughter may not avail himself of *Mills* because that decision was published in 1988, a year after the Supreme Court of Kentucky denied his claim on direct review. New rules of criminal procedure, such as the one enunciated in *Mills*, apply retroactively to all cases not yet final on direct review. *Booker*, 543 U.S. at 268, *Beard v. Banks*, 542 U.S. 406 (2004). Slaughter therefore could have, but did not, raise *Mills* in his petition for certiorari. Slaughter's conviction became final on June 12, 1989, the day that the Supreme Court of the United States denied Slaughter's petition. *See Beard*, 542 U.S. at 413. The scope of permissible authority in our review of habeas cases is limited to Supreme Court decisions available at the time the state court rendered its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Accordingly, we may not consider *Mills* in this case.

The Supreme Court of Kentucky did not have the benefit of *Mills*, which was decided on June 6, 1988. *Lockett v. Ohio*, which held that the sentencing body in a capital case cannot constitutionally be precluded from considering as a mitigating factor "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," was the governing legal principle in place at the time of the Supreme Court of Kentucky's decision. 438 U.S. 586, 604 (1978) (footnote omitted).[4] The challenged instruction in this case complied with *Lockett*. It did not require unanimity or in any way prevent jurors from considering mitigating factors. Instead, it told jurors to consider the mitigating factors that had been presented and that they believed to be true. The Supreme Court of Kentucky's decision was therefore proper under *Lockett*.

---

[4]The Supreme Court in *Mills* held that it is unconstitutional to require jurors to find mitigating circumstances unanimously. 486 U.S. at 375. Specifically, sentencing instructions that create a substantial likelihood that reasonable jurors might think that they are precluded from considering any mitigating evidence in the absence of unanimity are constitutionally invalid under *Mills*, 486 U.S. at 384. While *Lockett* could be thought to support the *Mills* rule, "reasonable jurists could have differed as to whether the *Lockett* principle compelled *Mills*." *Beard*, 542 U.S. at 414. Thus, the Supreme Court of Kentucky cannot be faulted for failing to predict *Mills*.

7.      *Jury instructions that said that jurors would "recommend" a punishment were not misleading*

Slaughter argues that the trial court violated his rights under *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) by instructing the jury that they would only "recommend" a sentence during the penalty phase.  *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id*.  In order to make out a claim under *Caldwell*, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law. *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994).  Slaughter has failed to make this showing.  After considering any aggravating and mitigating circumstances in a capital case, a jury in Kentucky "recommends" a sentence for the defendant.  K.R.S. § 532.025(1)(b).  Upon the findings of the jury, the trial judge then shall "fix" the sentence within the limits prescribed by law. *Id*.  "[T]he statutory scheme not only permits, but anticipates, that the trial court will play a separate and different role in sentencing in capital cases after the jury's verdict has been received." *Matthews v. Commonwealth of Kentucky*, 709 S.W.2d 414, 423 (Ky. 1985).  Under K.R.S. § 532.025(1)(b), when a jury recommends the death penalty, the trial judge is authorized to reduce the sentence to a term of imprisonment within the limits prescribed by law. *Smith v. Commonwealth of Kentucky*, 634 S.W.2d 411, 413-14 (1982).

The Supreme Court of Kentucky has long wrestled with jury instructions in capital cases that use the word "recommend."  In *Ice v. Commonwealth of Kentucky*, 667 S.W.2d 671, 676 (Ky. 1984), the court granted a death penalty defendant a new trial and held that "emphasis on the jury's sentence as only a recommendation is improper."  A year later, the court affirmed a defendant's death sentence and noted that although the Commonwealth stated that the jury would only "recommend" the death penalty, it was not used "to such an extent as to denigrate the responsibility of the jury in imposing a death penalty." *Kordenbrock v. Commonwealth of Kentucky*, 700 S.W.2d 384, 389 (Ky. 1985).  In *Tamme v. Commonwealth of Kentucky*, the Court stated that the Commonwealth's repeated use of the word "recommend" implied that the jury's recommendation held little or no weight and could be rejected by the court.  759 S.W.2d 51, 53 (1988). *Tamme* then held "[o]n retrial, the prosecutor should refer to the jury's function as 'fixing' sentence.  Furthermore, we hold that in capital cases in which trial commences after the effective date of the finality of this opinion, the word 'recommend' may not be used with reference to a jury's sentencing responsibilities in voir dire, instructions or closing argument." *Id*.  Technical violations of this rule do not constitute reversible error, *Foley v. Commonwealth of Kentucky*, 942 S.W.2d 876, 888 (Ky. 1996), and the rule does not apply retroactively. *Gall*, 231 F.3d at 330.

The Sixth Circuit has rejected arguments nearly identical to Slaughter's in at least two cases. *Id*. at 330; *Kordenbrock*, 919 F.2d at 1101.  The trial court's description of the jury's role accurately reflected Kentucky law at the time, which granted the trial court the power to reduce the penalty that the jury recommended. *Smith,* 634 S.W.2d at 413-14 (citing K.R.S. § 532.025(1)(b)).  While Slaughter's trial judge did use the word "recommend" in the jury instructions, he did not make profligate use of the word in a way that would confuse the jurors.  Finally, as the *Gall* and *Scroggy* courts held, the state cases that instruct Kentucky's courts to use the word "fix" instead of "recommend" do not apply retroactively.  Because the trial court's use of the word "recommend" was not contrary to *Caldwell*, Slaughter is not entitled to relief based on the jury instructions.

8.      *The verdict form was not unconstitutional*

Slaughter's final argument is that the Commonwealth denied him due process by using an unfair verdict form.  The form required the jury, if it chose a sentence of death, to write the aggravating factor on lines provided directly above the sentence.  The jury was not required to similarly memorialize the mitigating factors.  Such a form, Slaughter argues, necessarily skewed the

sentence toward death because it implicitly instructed the jurors not to consider the mitigating factors.

We must consider the verdict form in conjunction with the jury instructions. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). Here, the trial court explicitly admonished jurors to "consider such mitigating or extenuating facts and circumstances as have been presented to you in the evidence and you believe to be true . . . ." In addition, the jury instructions plainly required the jury to memorialize the aggravating factor *only* if it first concluded that a sentence of death was appropriate. In order to so conclude, the jury must have first taken the mitigating factors into account. In other words, the jury's memorialization of the aggravating factor could not have skewed its sentence because the jury had already made its decision by the time memorialization was required.

In support of his argument, Slaughter cites several Supreme Court cases which stand for the proposition that the Constitution prohibits the irrational or arbitrary imposition of the death penalty*, see e.g. Spaziano v. Florida*, 468 U.S. 447, 446-47 (1984). He fails, however, to reference any Supreme Court case requiring jurors to list mitigating factors when the verdict form requires them to list aggravating factors. Here, the verdict form did not result in the irrational or arbitrary imposition of the death penalty, and we therefore hold that the Commonwealth's use and approval of the form were not contrary to clearly established federal law. Accordingly, Slaughter is not entitled to relief on the basis of the verdict form.

For all of the foregoing reasons, we **REVERSE** the district court's grant of habeas relief on the basis of ineffective assistance of counsel, we **AFFIRM** the district court's denial of relief on all other grounds and we **DENY** Slaughter's motion to supplement the record.

———————————

**DISSENT**

———————————

R. GUY COLE. JR., Circuit Judge dissenting. The majority concludes that Radolovich's performance was constitutionally deficient. With this proposition, I am in complete agreement. However, because I believe that Slaughter was prejudiced by such deficient legal representation, and because I believe Slaughter preserved his federal claim, I respectfully dissent.

**I.**

At the RCr 11.42 hearing, Slaughter's post-conviction counsel presented mitigation evidence that was available at the time of trial, but which Radolovich had not uncovered or presented. This included testimony from Slaughter's mother, brothers, grandparents, and a friend, as well as testimony from a social worker, medical doctor, and educational specialist. Contrary to the majority's opinion, the evidence presented at the hearing is not only overwhelming, but is substantively more comprehensive than (and in many instances conflicts with) that presented during Slaughter's penalty phase. *See Workman v. Tate*, 957 F.2d 1339, 1346 (6th Cir. 1992) (holding that defendant was prejudiced by counsel's failure to present evidence that, although cumulative to some degree, "would have contradicted directly" negative testimony). This evidence is so substantial, in fact, that the trial court described it as "impressive," and stated that the court had "never been presented at trial with such an accumulation of 'mitigating' evidence during a penalty phase." Had this evidence been presented during the penalty phase, there is certainly "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

**A. Family**

Slaughter testified on his own behalf during the penalty phase. Although Radolovich prepared Slaughter to testify during the guilt phase, he did not prepare Slaughter for the all-important penalty phase. Regarding penalty-phase preparation, Radolovich testified that "[t]here was none to that . . . . Our whole thrust was on the guilt phase." During the penalty phase, Slaughter took the stand. On direct examination, Slaughter testified that he ran away from home when he was twelve-years old, that he dropped out of school in the seventh grade, and that he was on drugs at the time of the offense. Slaughter testified that he was not then providing financial support for his three-year old son. Furthermore, Slaughter testified that he had been involved in an incident in which his companions shot a man in a car. Slaughter testified that he did not do anything upon realizing the man had been shot.

Although Radolovich elicited some testimony that could fairly be described as mitigating, it was minimal. Slaughter testified that he was twenty years old, that his parents separated when he was three years old, that his father was killed in 1972, that his mother beat him with extension cords, that he ran away from home when he was twelve, that his mother died of cancer in 1980, that he had a young child, and that he was sorry about the victim's death. Slaughter also described his activities in prison, including his jobs in the prison hospital and the janitorial division. Radolovich did not present mitigating evidence from any other witness. He introduced no documents chronicling Slaughter's childhood, nor his school or medical history.

Had Radolovich properly investigated Slaughter's background, he would have been able to present the testimony of Slaughter's mother, Mary Moon, who was not deceased; Slaughter's two younger brothers, Bobby and Vincent Moon; and Slaughter's maternal grandparents, Clara and Charles Leonard. The jury would have learned that Slaughter had an exceptionally difficult

childhood. Mary Moon, Slaughter's mother, testified that she gave birth to Slaughter when she was only fifteen-years old, and that Slaughter's biological father abandoned him after spending only a month with Slaughter. The jury also would have learned that Slaughter's father was a thief, who provided no financial support for his son.

Thomas Moon, Mary's husband and the father of Slaughter's brothers, lived with the family for seven years, although he did not provide any support for the children. Mary testified that Thomas was an abusive alcoholic; she testified that due to fighting, there were police at their home every weekend. When Slaughter was eight years old, Thomas threatened to kill Mary and the children. Upon hearing this threat, Slaughter exited the front door of the house with his little brother in his arms. Thomas Moon shot at the children through the front door, but did not hit them. Mary Moon and her children left Thomas after that incident.

Mary Moon testified that Slaughter was raised in impoverished circumstances. After she left Thomas, she had another child named Vincent. Although Vincent's father helped support Vincent financially, no one else provided additional financial support to the family. To support her family, Mary Moon worked as a cleaning woman, for which she earned $5 a day. At her job at the local sawmill, she earned $1.35 an hour, and she earned an additional $1.05 an hour working as a waitress. Moon did not receive assistance from the state, and she and her children lived in low-income housing. Slaughter attempted to help his mother financially, by cutting grass at cemeteries and doing odd jobs. When Slaughter's grandmother was not able to care for the children, Slaughter was charged with taking care of his two younger brothers. Both brothers testified that they were usually left in Slaughter's care, who was only four years older than the eldest of his younger brothers.

The jury would have learned that Mary Moon was abusive to Slaughter and his brothers. She testified: "I really whooped the devil out of my children." She testified to beating Slaughter so badly that scars remain on his back. She would beat him with a switch or a belt, and when he made her angry enough, she would beat him with whatever it was she had in her hand at the time. Bobby Moon confirmed Mary Moon's testimony; he testified that their mother would beat them with a variety of objects: "We got whoopens with a belt, switches, extension cords, broom, probably the first thing she could pick up, 'cause she was mad." Vincent testified that he saw his mother beat Slaughter with an extension cord. He also testified that his mother would lock them in their rooms without food, but that when Vincent was locked up, Slaughter would slip him food after their mother left for work.

Furthermore, the jury would have learned that Slaughter could not retreat into the neighborhood to escape his turbulent home life. Both brothers confirmed that they had a difficult childhood, and testified that their neighborhood was crime-ridden. Despite the prevalence of crime in their neighborhood, Vincent testified that none of the brothers, including Slaughter, used drugs or alcohol.

The jury would have further learned that despite the fact that Slaughter had a difficult childhood, he was exceptionally close with his family. Referring to Slaughter's grandmother, Mary Moon testified that "[s]he was his heart. He was her heart too." Up until her death in 1991, Slaughter talked to his grandmother on the phone every week. Charles Leonard, Slaughter's maternal grandfather, testified that when Slaughter lived with his mother, they visited Leonard during the summer. Bobby Moon testified that Slaughter took care of him and Vincent. "[H]e did everything for us. You know, he made sure we was [sic] fed and, you know, we was there at the house. He basically took care of us." Vincent similarly testified that Slaughter cooked for them, and did his best to provide for them.

Bobby testified that Slaughter encouraged his younger brothers to stay out of trouble, and that he always gave them good advice. Both brothers testified that when they were children, Vincent found a bullet, which Slaughter took away from him. Vincent testified that when Slaughter was asleep, he recovered the bullet, which subsequently exploded in Vincent's face. Vincent testified that Slaughter picked him up, took him across the street, and convinced a neighbor to take them to the hospital.

Finally, the jury would have learned that Slaughter received a head injury when he was five years old. Mary Moon testified that she believed that Slaughter hit his head on the corner of the refrigerator; the gash took at least ten stitches to close. Slaughter received no further medical care for the injury, until he began suffering from terrible headaches. At that point, he also started "falling out." Moon took him to a doctor, who recommended that he see a specialist, which Moon could not afford. Instead, she took Slaughter to another doctor, hoping that the doctor would prescribe pills or some other form of relief. Slaughter never received proper treatment for his injury. According to Moon, Slaughter did receive some x-rays, and the doctors wanted him to go to Birmingham, Alabama, for more specialized treatment. However, because she did not have insurance, he did not receive any such treatment. Slaughter's grandmother and grandfather both testified that Slaughter suffered from severe headaches as a child.

Perhaps most importantly, the jury was deprived of the opportunity to observe that, despite this abuse, Slaughter's family cared about him deeply. Slaughter's mother, brothers and grandparents each testified that they did not even know about the trial until after it had taken place. Not one of them was contacted by Radolovich to testify on Slaughter's behalf. Each testified at the hearing that they would have been eager to testify on Slaughter's behalf. Mary Moon testified that she loved Slaughter. Bobby Moon also testified that he cared about his brother:

> I can say – I think about my brother every night. I love my brother a lot. I just can't explain to the Court how I feel about him. [inaudible] excuse me. There's not a night that I don't think about my brother. I think about him everyday. I love him a lot, I really do.

Bobby testified that he did not want to see Slaughter die in the electric chair, and that if he did, he "probably couldn't make it [him]self." Vincent testified that he loved Slaughter, and that he did not want to see him die.

## B. Expert Testimony

The majority concludes that Slaughter was not prejudiced by the Radolovich's reliance on Dr. Johnson's testimony. Dr. Johnson, a psychiatrist from the Kentucky Correctional Psychiatric Center,[1] described Slaughter as cavalier, as having an extensive history of anti-social behavior, and as a "marginally functioning individual" with a predisposition for violent activities. Dr. Johnson testified that Slaughter was uncooperative during the examination and that Slaughter has a borderline personality disorder. He testified that "[b]order-line individuals typically experience a wide variety of problems in their life, problems with their families, problems in occupation, problems in academic achievement, difficulties ranging from moderate to severe across virtually every dimension of their life." During cross–examination, Dr. Johnson testified that a high percentage of people who commit robbery and murder have an anti-social personality disorder.

Dr. Johnson also testified that Slaughter had abused alcohol, amphetamines, cannabis, and hallucinogens. He testified that Slaughter's functioning was very poor, noting "marked impairment

---

[1]Radolovich did not seek funds to hire an independent expert to evaluate Slaughter, although it was common in Lexington in 1983 to seek such funds in death penalty cases.

in both social relations and occupational functioning." He further testified that Slaughter had never held steady, legal employment, and had obtained no lasting interpersonal relationships with friends or family. Dr. Johnson testified that without treatment, "Mr. Slaughter in all likelihood would continue his lifestyle very much as it has been for the last fifteen years or so, kind of nomadic lifestyle, wandering around the country, never establishing any permanence, never achieving much of anything in his life, never contributing anything in society . . . ."

Dr. Johnson's testimony does not strike me as mitigating. As Radolovich expressed during his testimony in the RCr 11.42 hearing, "Dr. Johnson's testimony was harmful."

Although the majority conveys great confidence in the accuracy of Dr. Johnson's assessment of Slaughter, the expert witnesses testifying at the RCr 11.42 hearing were understandbly skeptical. Dr. Delbert Drogin, a clinical psychologist and attorney in Kentucky, reviewed Dr. Johnson's evaluation of Slaughter. Dr. Drogin testified that at the time of Slaughter's evaluation, Dr. Johnson had been licensed to practice as a psychologist for only a year. Dr. Drogin further testified that it did not appear that Dr. Johnson received any information about Slaughter from his family members, nor did it appear from his report that Dr. Johnson conferred in any significant manner with Slaughter's attorney.

Dr. Drogin testified that although Dr. Johnson attempted to administer a series of intelligence tests on Slaughter, he did not successfully administer any test that was an adequate measure of Slaughter's intelligence. The order in which Dr. Johnson attempted to administer tests is unclear from his report, and thus drastically undermines the accuracy of those tests. Dr. Drogin further testified that there were errors in the administration of some of the tests: correct answers were marked as incorrect, the scoring was incorrectly totaled, and some answers had been written and crossed out. Dr. Drogin testified that by misscoring a key test, Dr. Johnson effectively cut Slaughter's IQ by up to 25 points, an error that Dr. Johnson failed to notice or remedy. Based on these errors, Dr. Drogin testified that he had very little confidence in Dr. Johnson's report. "[T]here are two classes of mistake that are there on their face. I don't know what else it might have right or wrong about the test." Similarly, Dr. Drogin testified that he had very little confidence in Dr. Johnson's testimony during the penalty phase, because it was based on his inaccurate testing.

In evaluating Slaughter, Dr. Johnson further relied on the Rorschach Personality Test, wherein the subject interprets a series of inkblots. Dr. Drogin testified that the test is not a valid measure in a forensic evaluation, because there are too many questions about its reliability and validity. Furthermore, Dr. Drogin testified that Dr. Johnson "partially or mostly" scored the Rorschach test. Dr. Drogin testified that, because Dr. Johnson did not include any of results of the Rorschach test in his report, it is not "possible to evaluate the accuracy of [Dr. Johnson's] ultimate conclusions."

Dr. Drogin testified that the Rorschach Personality Test and the Meyer Incomplete Sentence Test, another test that Dr. Johnson administered unsuccessfully, were not objective tests, and were thus not reliable indicators of personality. The only objective test Dr. Johnson attempted to perform was the Minnesota Multiphasic Personality Inventory ("MMPI"), which consists of over 500 true/false questions, which Slaughter never completed. Dr. Drogin testified that the MMPI is regarded very highly by clinical psychologists, in contrast to the tests upon which Dr. Johnson ultimately relied. Dr. Drogin testified that based on Slaughter's score sheet, it appeared that he had answered twenty fairly random questions. Dr. Drogin testified that based on the pattern of responses, he could not ascertain anything from the answer sheet – not even the order in which the answers were originally filled out.

In his report, Dr. Johnson said about the MMPI: "Generally the patient was reluctant to constructively participate in taking the MMPI and stated that he preferred to talk to examiner." Dr.

Drogin testified that Slaughter's score sheet revealed "twenty separate attempts to do something with this test." He testified that Slaughter's ability to answer some questions, but not complete the whole test, could be explained by confusion, improper instruction, or that fact that Slaughter was taking his time, as opposed to a refusal to cooperate. Dr. Drogin opined that Slaughter might have answered some but not all of the questions because of difficulty reading or comprehending the questions. In order to complete the test, Dr. Drogin testified that the MMPI could have been administered to Slaughter orally, or given on an audio tape, neither of which Dr. Johnson appeared to attempt.

Dr. Drogin commented on Dr. Johnson's testimony regarding Slaughter's alleged history of drug and alcohol abuse. Dr. Drogin testified that at the time that Dr. Johnson evaluated Slaughter, there were objective tests for drug and alcohol abuse, including subtests of the MMPI and a test for substance abuse known as the Alcohol Use Inventory. However, Dr. Drogin found no evidence that Dr. Johnson used any of the readily available objective tests to determine drug or alcohol abuse.

Most troubling is the fact that Slaughter received a score indicating that his competency was "borderline" on the Competency Screening Test. Dr. Johnson indicated on Slaughter's score sheet that "[m]ore clarification is needed on the competency to stand trial assessment instrument." Dr. Drogin testified that there was no indication that Dr. Johnson took further steps to determine Slaughter's competency to stand trial. The fact that Slaughter's competency level was "borderline" was never reported to the trial court in Dr. Johnson's report.

Regarding Dr. Johnson's evaluations, Dr. Drogin testified that he did not have confidence in Dr. Johnson's diagnoses. Dr. Drogin testified that if a psychologist is unable to reach a conclusion based on testing, he should try to obtain additional information. If a psychologist were still unable to reach a conclusion based on the evidence in his possession, he should note that inability in the report, and decline to draw a conclusion regarding the patient. Dr. Johnson failed to do so.

Dr. Engum, a clinical psychologist specializing in neuropsychology and forensic psychology, also testified at the RCr 11.42 hearing. He too strongly disagreed with each of Dr. Johnson's conclusions. Dr. Egnum conducted a series of objective, standardized tests on Slaughter, including the Wechsler Intelligence Scale Revised Test on IQ, the Halstead Reitan Neurological Battery test of neuropsychological functioning, and a variety of ancillary assessment techniques of learning, memory, problem-solving, conceptual reading, motor speed, coordination and academic skills.

Based on Slaughter's test results and the Diagnostic and Statistical Manual (Fourth Edition), Dr. Engum diagnosed Slaughter with a cognitive disorder, not otherwise specified (NOS), and attention deficit disorder. Dr. Engum testified that as far as he could determine, Slaughter's cognitive disorder was the result of a brain injury, based on the "depressed skull fracture, [and] the localization on the right frontal lobe." Dr. Engum testified that a cognitive disorder could have an impact on a person's ability to understand legal concepts, such as those implicated by the *Miranda* warnings, mitigation, and aggravation.

Additionally, Dr. Engum conducted a personality assessment, using standardized actuarial objective personality tests, such as the Minnesota Multiphasic Personality Inventory (which he described as the "gold standard" for personality tests) and the Meyer Clinical Multiaxil Inventory. Based on the personality tests, Dr. Engum concluded that Slaughter has a paranoid personality disorder, which was a result of his background, where "survival is an important aspect of daily existence." Dr. Engum testified that Slaughter's childhood had "lots of threats in the environment," "lots of reasons to distrust people and things," and was a place where "not a lot of importance [was] put upon things such as academic achievement or more of what we consider the middle class kinds of values."

Significantly, Dr. Engum testified that Slaughter was not a sociopath. Dr. Engum also testified that he disagreed with Dr. Johnson's conclusion that Slaughter has borderline personality disorder; based on Dr. Johnson's reports, Dr. Egnum testified that he had not performed any tests that would allow him to conclude validly that Slaughter had borderline personality disorder. Dr. Engum also disagreed with Dr. Johnson's conclusion that Slaughter would not be a good candidate for rehabilitation. Based on the results of the Meyer Clinical Multiaxil Inventory, the MMPI, and the Personality Assessment Inventory, Dr. Engum testified that he believed Slaughter could overcome the vast majority of his problems if placed in the right environment. Further, Dr. Engum pointed to Slaughter's scores on the Wechsler Adult Intelligence Scale, particularly his scores on the social comprehension and judgment sub-tests, and the picture arrangement sub-test. Dr. Engum testified that Slaughter's high scores on these tests indicate that he has social judgment, social comprehension, and a strong sense of cause and effect, all of which would make him a good candidate for rehabilitation. Dr. Engum also indicated a lack of a major psychopathology and the lack of significant drug or alcohol problems. Finally, he testified that to the extent that the science of predicting future violent behavior would allow, Dr. Engum believed that Slaughter would neither kill someone in a penitentiary, nor kill someone in the community.

Lane Veltkamp, a clinical social worker at the Department of Psychiatry at the University of Kentucky Medical Center, described Slaughter's relationship with his father as one of "abandonment and neglect[]." Slaughter's father was "in no way involved" in Slaughter's life. Veltkamp testified that because Slaughter's father was absent, Slaughter did not have the benefit of a male role model. Veltkamp testified that when Slaughter was eight or nine, he was put in charge of his younger brothers. He testified that although Slaughter did take significant responsibility for his brothers, including providing food and supervision, Slaughter was too young for that level of responsibility. Veltkamp testified that this "role reversal" is very wearing on a child. As a result of his obligations at home, Slaughter often slept in school, and had a variety of problems.

Veltkamp and Dr. Gary Kearl, a medical doctor specializing in family medicine and the treatment of children who may be the victims of sexual and physical abuse, testified as to the extent of the physical abuse Slaughter received. Veltkamp testified that Slaughter has "scars all over his body and was hit with belts and extension cords and slapped and so on." Upon examination, Dr.Kearl observed a number of scars on Slaughter's back, shoulders, chest, lower legs, forearms and thighs. These scars were consistent with Bobby and Vincent's testimony that as a child, Slaughter had been beaten with braided switches, leather belts and extension cords. Dr. Kearl testified that the lacerations on Slaughter's forearm also suggested neglect; the size of the scar indicated that Slaughter received a wide cut that was not sutured. Dr. Kearl testified that the particular laceration was so deep that it cut through the underlying muscle.

Dr. Kearl also observed a scar on Slaughter's head at the hairline, consistent with Mary Moon's testimony that Slaughter had incurred a head injury. Slaughter told Dr. Kearl that he had trouble sleeping at night, had difficulty seeing objects that were far away, and that he had suffered from recurring headaches ever since he was a young child. Dr. Kearl testified that beneath the scar, Slaughter's skull was depressed. Dr. Kearl expressed concern that Slaughter's skull was not x-rayed at the time of the injury; not only did the failure to seek medical care indicate abuse,[2] but conventional skull films would have shown how deep or severe Slaughter's skull fracture was, and whether surgery was needed to place the skull bones back in their original position. Such films would have also helped determine whether there was an underlying accumulation of blood, known as a hematoma, which could cause brain damage. "If it were there and it were not treated properly,

---

[2]The family's poverty should not have prevented Slaughter from receiving treatment. Dr. Kearl testified that in the late 1960s, there were a number of hospitals in Slaughter's area that would have accepted Slaughter as a patient.

that could have resulted then in brain damage and subsequent decreased reasonability." Dr. Kearl testified that Slaughter still has a depressed skull fracture.

## II.

In *Strickland*, the Supreme Court explicitly set forth the test for determining whether ineffective assistance of counsel prejudiced a criminal defendant. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. This test does not require that Slaughter prove that it is more likely than not that he would have received a life sentence if not for the deficient performance of counsel; the Supreme Court has explicitly rejected such a stringent test for prejudice. *Strickland*, 466 U.S. at 693 ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). *See also Hodge v. Hurley*, 426 F.3d 368, 376 n.18 (6th Cir. 2005) (noting that the *Strickland* standard requires less than a preponderance of the evidence); *Harries v. Bell*, 417 F.3d 631, 639 (6th Cir. 2005) (holding that petitioner need not show that counsel's deficient performance more likely than not altered the outcome); *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome, but something less than a showing that the outcome more likely than not would have been different.") (citations omitted); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (*Strickland* "does not require showing that counsel's unreasonable performance more likely than not altered the outcome in the case."). Applying this standard, we must only ask whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Given the voluminous amount of mitigating evidence presented at the post-conviction proceeding, and the shockingly paltry and negative evidence presented during the penalty phase of the trial, there is clearly a reasonable probability that the jury would have sentenced Slaughter to life imprisonment had it been presented with the evidence that was presented at the RCr 11.42 hearing. Contrary to the assertion by the majority, the evidence presented in the post-conviction hearing did not merely expound on that presented during the penalty phase. Notably, Dr. Engum disagreed with Dr. Johnson's conclusions that Slaughter suffered from borderline personality disorder, and would not be a good candidate for rehabilitation. He further disagreed with Dr. Johnson's conclusion that Slaughter was predisposed toward violence.

Furthermore, nothing in the testimony presented during the penalty phase suggested that Slaughter was a devoted son and brother. Nothing suggested that he had family that was willing, let alone eager, to testify on his behalf. In fact, the jury heard testimony that Slaughter had not formed meaningful relationships with family members. Although Slaughter testified that his mother beat him, his testimony did not reveal the extent to which he was neglected as a child. The penalty phase testimony did not reveal that Slaughter had a learning disability, nor did it reveal that Slaughter suffered from a significant head injury as a child.

The majority opines that the jury learned all it needed about Slaughter's background from the testimony of Slaughter and Dr. Johnson. Our precedent makes clear, however, that a defendant can be prejudiced by counsel's deficient presentation of mitigating evidence even when *some* mitigation is presented to the jury. *See Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005) (holding that defendant was prejudiced by counsel's failure to present mitigating evidence on traumatic childhood, physical abuse, and head injury, despite the fact that defendant and a

psychiatrist offered mitigating testimony during the trial[3]).  Furthermore, we have held that a defendant can be prejudiced when trial counsel fails to adduce enough information regarding mitigating circumstances, despite the fact that the jury is made aware of the bare contours of a defendant's woeful history.  *See Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1996) ("Here the jury was given virtually no information on [the defendant's] history, character, background and organic brain damage – at least no information of a sort calculated to raise reasonable doubt as to whether this young man ought to be put to death.").  In *Glenn*, a minister, teacher and lawyer testified on the defendant's behalf.  *Glenn*, 71 F.3d at 1207.  As Slaughter did, Glenn testified on his own behalf. *Id.* at 1208.  As in the instant case, none of the testimony revealed that the defendant may have suffered from brain damage.  *Glenn*, 71 F.2d at 1210.  As was the case here, Glenn's trial counsel never talked to his siblings or family members.  *Glenn*, 71 F.3d at 1208.

The majority's denial of the writ runs counter to the relief granted in *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003).  There, as here, post-conviction proceedings revealed a wealth of mitigation that was not presented to the jury during the penalty phase.  There, as here, trial counsel put on a pathetic display of largely negative evidence during the penalty phase.  *Id.* at 491. Slaughter, like Hamblin, grew up in extreme poverty and neglect.  *Id.* at 490.  They both lived with an abusive, alcoholic father who beat their mother.  They were both left to fend for themselves, without the supervision or assistance of their mother.  Both attempted to care for younger siblings. Neither received a proper education.  They both started getting into trouble with the law as teenagers.  Both have demonstrated psychological problems.  Both suffered from a severe blow to the head during childhood.  In both cases, extraordinary mitigating evidence was only revealed in post-conviction proceedings.  Like the petitioner in *Hamblin*, Slaughter was prejudiced by his attorney's failure to present compelling mitigation to a jury.

In concluding that Slaughter was prejudiced by Radolovich's failure to investigate or present mitigating evidence, the district court summed up the image of Slaughter the jury must have had. Rather than seeing the man described in post-conviction proceedings,

> [T]hey saw "James Earl Slaughter," in many senses, the man who never was, standing alone and defiant.  Slaughter was a man [who] testified recklessly; a man who apparently was so unloved and so uncared for that not a single individual, relative or friend would vouch for him, though his life hung in the balance.

Had Radolovich investigated Slaughter's background, he would have found an entire family willing to testify on his behalf.  The jury would have learned that Slaughter was abused as a child, that he cared for his younger brothers, and that he suffered a head injury.  Most importantly, they would have learned that he had a family who cared about him.  The district court correctly concluded that but for Radolovich's failure to investigate and present a full picture of Slaughter's life, there is a reasonable probability that the result of the penalty phase would be different.  "[T]he presentation of even a substantial subset of the mitigating evidence detailed above 'would have humanized Petitioner before the jury such that at least one juror could have found he did not deserve the death penalty.'"  *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (quoting *Carter v. Bell*, 218 F.3d 581, 592 (6th Cir. 2000)).

## III.

Slaughter also argues that he was denied due process and an impartial sentencing jury when the trial court allowed a juror to question him.  After Slaughter testified at the penalty phase, a juror asked the following:

---

[3]See *Harries v. State*, 958 S.W.2d 799, 806-08 (Tenn. Crim. App. 1997), for a discussion of the mitigation presented at trial.

> I have a question. He stated that he knew, he and this Red had been friends for sometime. Where did this Red live[?] He would had to visit or something. Where did this Red live? Where did he hangout at? Why didn't any of your friends know about you and Red and since you...

When Slaughter refused to answer the question to the juror's satisfaction, the juror responded:

> You are asking for your life and nobody can find Red and you refuse. Why do you refuse to tell his address so he can be found to save you probably?

At this point, defense counsel asked to approach the bench and interrupted the questioning. Counsel moved for a mistrial, and argued that the juror had shown a "predisposition before the close of any evidence." The trial court denied the motion. On direct appeal, the Supreme Court of Kentucky rejected Slaughter's argument. That court noted that Slaughter did not testify during the guilt phase, and that the question took place during the sentencing phase after Slaughter had been found guilty. Relying on Kentucky law, that court then held that it is proper for jurors to ask questions of the defendant. The state court did not address the issue as a matter of constitutional law. The Supreme Court of Kentucky declined to consider the issue upon a RCr 11.42 motion, because it had considered the issue on direct appeal.

The extent of Slaughter's constitutional argument before the Kentucky Supreme Court was a reference to due process, followed by a citation to the Fourth and Sixth Amendment. Relying on *Levine v. Torvik,* 986 F.2d 1506 (6th Cir. 1993), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995), Slaughter now argues that a federal claim is fairly presented if a petitioner cites to a provision of the U.S. Constitution. *Id.* at 1516 (holding that a habeas petitioner properly presented his federal claim in state court insofar as he alleged that due process prohibits confinement of a person found not guilty by reason of insanity when that person is no longer mentally ill); *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) ("The ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts well within the mainstream of constitutional litigation." (emphasis omitted)). *See also*, *Purnell v. Missouri Dept. Of Corrs.*, 753 F.2d 703, 706 (8th Cir. 1985) ("[R]eference to the Constitution, a federal case, *or* a specific constitutional right [is required] to meet the 'fair presentation' and 'fair opportunity tests.'") (emphasis added); *Petrucelli v. Coombe*, 735 F.2d 684, 688-87 (2d. Cir. 1984) ("It is not necessary for a habeas petitioner to cite 'book and verse' of the Constitution," in order to put state court on notice that they are to decide federal constitutional claims).

Before the Kentucky Supreme Court, Slaughter argued: "Based on this denial of due process and a fair trial by an impartial jury, appellant is entitled to a new trial. 14th and 6th Amendments. Section 11 of the Kentucky Constitution." Under *Levine*, Slaughter sufficiently notified the state court of his federal argument by citing a provision of the United States Constitution. *See Levine*, 986 F.2d at 1516. *See also Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003) ("There is no requirement that the petitioner cite to cases that employ federal constitutional analysis where he has phrased his claim in terms of a denial of a specific constitutional right."). This holding is entirely consistent with *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004), in which the petitioner did not cite a specific provision of the Constitution. To the extent that *Blackmon* is inconsistent with *Levine*'s holding that citation to a provision of the Constitution is sufficient to preserve a claim based on federal law, we are obligated to follow *Levine*. *See Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431 n.1 (6th Cir. 2000) ("When a later decision from this court conflicts with its prior decisions, the earlier cases control.").

The majority argues that this case is distinguishable from *Dye v. Hofbauer*, 126 S.Ct. 5 (2005), in which the Supreme Court reversed our holding that a petitioner had failed to preserve his federal claim in the state court. Although this case is certainly distinguishable, the majority would ignore the remaining body of Supreme Court precedent. Thus, we must take heed of the Supreme Court's instruction in *Baldwin v. Reese*, 541 U.S. 27, 31 (2004), which informs us that:

> A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

In fact, Supreme Court precedent informs us that Slaughter may have in fact gone above and beyond what is required under the law to preserve his federal claim. "[T]o state a federal due process claim it is not necessary to invoke the talismanic phrase 'due process of law' or cite book and verse of the federal constitution." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citations omitted). Slaughter not only invoked due process, but he cited the specific book and verse of the federal constitution, a step explicitly cited as unnecessary by the Supreme Court. To the extent that the law of our circuit requires more, it conflicts with Supreme Court precedent and obviously cannot bind this court. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 501 (6th Cir. 2002).

## IV.

Because the majority turns a blind eye to the breadth and depth of mitigating evidence presented during the RCr 11.42 hearing, all of which have been presented during the penalty phase, and because the majority ignores Supreme Court precedent as to the action a defendant must take to preserve his federal claim, I respectfully dissent.