RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SHAWN L. HAWKINS,
     *Petitioner-Appellee/Cross-Appellant,*

     *v.*

RALPH COYLE, Warden,
     *Respondent-Appellant/Cross-Appellee.*

Nos. 05-4032/4049

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 97-00296—Susan J. Dlott, District Judge.

Argued: April 30, 2008

Decided and Filed: November 18, 2008

Before: BATCHELDER, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Anthony G. Covatta, Jr., DREW & WARD CO., LPA, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Anthony G. Covatta, Jr., Robert M. Smith, DREW & WARD CO., LPA, Cincinnati, Ohio, for Appellee.

_____

## OPINION

_____

ALICE M. BATCHELDER, Circuit Judge. Respondent Ralph Coyle, a warden, appeals the district court's order granting Shawn L. Hawkins a writ of habeas corpus on the grounds that, at sentencing, his trial counsel was ineffective in failing to conduct any investigation for mitigation purposes. Hawkins, in turn, appeals the district court's denial of habeas relief on all other grounds asserted in his Amended Habeas Petition. For reasons explained below, we REVERSE the district court's grant of relief on the basis of ineffective assistance of counsel and we AFFIRM the district court's denial of relief on all other grounds.

## I. BACKGROUND

The district court accurately summarized the uncontested facts and procedural history:

On June 11, 1989, Diamond Marteen and Jerome Thomas were interested in buying a pound of marijuana. Terrance Richard knew Shawn Hawkins to be a potential seller. Richard, Marteen, and Thomas drove to Hawkins' residence on Newbrook Drive in Mt. Healthy, Ohio that evening in a silver-gray Hyundai sedan owned by Richard's mother. Hawkins negotiated the terms of a drug deal with the men. Hawkins provided the men with a pager number so that they could contact him later for the delivery of the drugs. The three men showed Hawkins the approximately $1,400 in cash that they intended to use to purchase the marijuana. Thomas testified that Hawkins never entered the Hyundai sedan during the drug deal negotiations.

Thereafter, Richard and Marteen drove Thomas to work at approximately 10:30 p.m. Richard and Marteen then proceeded to the home of Melissa Edwards. They used her telephone to page someone and received a return phone call. Richard and Marteen left Edwards' home after receiving the telephone call.

Some time in the late hours of June 11, 1989, or the early morning hours of June 12, 1989, Richard and Marteen were killed. The bodies of Richard and Marteen were discovered mid-morning on June 12, 1989, in the Hyundai sedan owned by Richard's mother on Elizabeth Street, a residential street in Mt. Healthy. Marteen's body was found in the front passenger seat in a reclined position; Richard's body was found in the rear seat. Each man had been shot twice at close range in the left side of the head. All four shots were fired from a .25 caliber weapon. The weapon was never recovered.

Crime scene investigators determined that the crime had occurred in another location and that the vehicle had been moved shortly after the killings. Investigators found no money in the vehicle except for loose change. Jewelry that Marteen had been wearing the night before was missing from his body. His pants pockets were turned partially inside out. A morgue attendant later found a napkin on which a pager number was written in one of Richard's pockets. The pager number was discovered to be one used by Hawkins.

The police contacted Hawkins as a potential witness to the murders. He admitted to having discussed a drug deal with the victims on the evening of June 11, 1989. However, Hawkins testified at trial that the deal was not consummated because he was unable to get in touch with his suppliers. Hawkins told the police that he never saw the victims after 9:00 p.m. on June 11th. The police stated that Hawkins denied having entered the Hyundai sedan.

Forensic experts identified two fingerprints matching Hawkins' prints inside the Hyundai. One of the prints, a thumbprint, was set in human blood on a blood-spattered notebook recovered from the floor of the rear of the automobile. The thumbprint could have been made only by a bloody thumb touching the notebook or by a thumb touching a bloodstain on the notebook. The blood on the notebook was Type A which matched the blood type of both victims. The second fingerprint was found on the right rear door of the Hyundai.

Henry Brown, Jr., a seventeen year-old juvenile, eventually came forward to identify Hawkins as the killer. Brown told the authorities that on June 12, 1989 at 12:30 a.m. he saw Hawkins kill Richard in the rear seat of a Hyundai sedan on a cul-de-sac on

Newbrook Drive. Brown stated that Marteen already was dead in the front seat. Brown stated further that Hawkins rummaged through the vehicle and drove it from the murder scene. He described the murder weapon as a .25 caliber handgun. He stated that Hawkins was wearing a black muscle shirt at the time of the murders.

Other witnesses described hearing four gun shots on June 12, 1989, between approximately 12:30 a.m. and 1:00 a.m., originating in the cul-de-sac area of Newbrook Drive. Several minutes after the shots, Kenneth Boehmler saw a silver-gray sedan driving in a suspicious manner on Hudepohl Lane, one block south of the Newbrook Drive cul-de-sac. When the driver of the sedan exited the vehicle for a few moments, Boehlmer identified him as wearing a dark muscle shirt and described his height, weight, and build in a manner consistent with Hawkins' height, weight, and build. Boehmler also saw someone reclining in the front passenger seat as if asleep.

In September 1989, Hawkins was indicted for the aggravated murders of Richard and Marteen. For each of the two murders, Hawkins was indicted on two counts: one charging that the offense was committed with prior calculation and design and one charging felony murder premised upon aggravated robbery. Each of the four counts of aggravated murder carried two death penalty specifications. Hawkins also was indicted on two counts of aggravated robbery with a firearm.

Hawkins was tried in December 1989 before a jury in the Hamilton County, Ohio Common Pleas Court. He testified on his own behalf and denied the murders and robberies. He also presented the testimony of other witnesses. Nonetheless, the jury convicted Hawkins of all charges and all specifications. The jury recommended a death sentence for each aggravated murder count. The trial court sentenced Hawkins to death.

Hawkins appealed the verdict to the Ohio First District Court of Appeals and the Ohio Supreme Court, both of which affirmed his conviction and sentence of death. The Ohio Supreme Court also sua sponte merged the two separate convictions for each murder so that a single death sentence remained for each homicide. The Ohio Supreme Court denied Hawkins' motion for rehearing and the United States Supreme Court denied certiorari. Hawkins' petition for post-conviction relief also was denied by the state courts. Finally, Hawkins' Application to Reopen under Ohio R. App. P. 26(B) and additional motions for reconsideration and petitions for writs of certiorari were denied by the Ohio courts and the Supreme Court.

*Hawkins v. Coyle*, 2005 U.S. Dist. LEXIS 35538, at *2-6 (S.D. Oh. July 19, 2005).

In 1997, Hawkins petitioned for a writ of habeas corpus in the Southern District of Ohio, advancing twenty-seven claims for relief. After discovery and an evidentiary hearing, the district court denied twenty-six of Hawkins's claims, and granted relief on one, Hawkins's second claim: ineffective assistance of trial counsel. The court found Hawkins's counsel constitutionally ineffective because in preparation for the sentencing phase, he failed to conduct any investigation for mitigation purposes, choosing instead to rely on a theory of residual doubt. The State of Ohio now appeals that determination. The district court granted Hawkins a Certificate of Appealability (COA) on five of his other theories of recovery. Hence, the following grounds for habeas relief (which we have numbered as they appear in the habeas petition) are before us in this appeal:

2.      Hawkins was denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments by his trial Counsel's utter lack of investigation and preparation for the mitigation phase of his capital trial.

3.      The cumulative effect of the State's misconduct regarding Keith Miree violated Petitioner Hawkins' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and prejudiced him.

4.      The State's misconduct regarding the bloody fingerprint violated Petitioner Hawkins' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

7.      The prosecutor's failure to provide Hawkins' counsel with material and exculpatory evidence violated his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

11.     The trial court's denial of Hawkins' Motion for Mistrial based on prosecutorial misconduct violated Hawkins' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

27.     The trial court violated Mr. Hawkins' right to confront, present a defense, due process and equal protection as guaranteed by the Sixth, Eighth and Fourteenth Amendments when the court failed to disclose and seal Henry Brown's juvenile records.

## II.  STANDARD OF REVIEW

When reviewing a district court's decision to grant a writ of habeas corpus, we review de novo the court's legal conclusions and its factual findings for clear error. *Slaughter v. Parker*, 450 F.3d 224, 232 (6th Cir. 2006) (citing *Smith v. Hofbauer*, 312 F.3d 809, 813 (6th Cir. 2002)).  We also review de novo the district court's findings on mixed questions of law and fact. *United States v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004).

Because Hawkins filed his habeas petition in 1997, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply. *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (AEDPA applies to petitions filed after April 24, 1996).  Title 28 U.S.C. § 2254 restricts the ability of federal courts to grant habeas relief:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

"A state court decision is 'contrary to' clearly established Federal law if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and

arrives at a different result." *Slaughter*, 450 F.3d at 232 (quoting *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (internal quotations omitted)). Furthermore, the statute "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final." *Williams v. Taylor*, 529 U.S. 362, 380 (2000).

We may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Slaughter*, 450 F.3d at 232 (citing *Williams*, 529 U.S. at 407-08). "A federal habeas court may not issue a writ under the unreasonable application clause simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

As the text of § 2254(d) makes clear, this AEDPA standard applies only to claims that were "adjudicated on the merits in State court proceedings." "When a prisoner who filed his habeas petition after AEDPA's effective date properly raised a claim in state court, yet that court did not review the claim's merits, AEDPA deference does not apply, and the federal habeas court reviews legal issues de novo." *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007) (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)).

Where the state court disposes of a Federal constitutional claim with little-to-no articulated analysis of the constitutional issue, this circuit applies a modified form of AEDPA deference. *See, e.g., Vasquez*, 496 F.3d at 569-70, 574-75 (applying modified AEDPA deference where the state court held that any Confrontation Clause violation was harmless error); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005) (applying modified AEDPA deference where the state court of appeals, in response to a due process challenge and with no analysis, held that there was "no error" in the admission of identification testimony, and even if there were, it was "harmless beyond a reasonable doubt"); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000) (applying modified AEDPA deference where the state courts disposed of the constitutional issues without analysis, by summary order and denial of leave to appeal). This modified-AEDPA standard requires that we "conduct[] a 'careful' and 'independent' review of the record and applicable law, but [we] cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law.'" *Vasquez*, 496 F.3d at 570 (quoting *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005); citing *Howard*, 405 F.3d at 467)). In other words, in such cases, we must "focus on the *result* of the state court's decision, applying" AEDPA deference to the result reached not the reasoning used. *Harris*, 212 F.3d at 943 n.1 (emphasis in original).

## III. INEFFECTIVE ASSISTANCE

The State of Ohio appeals the district court's determination that Hawkins's trial counsel rendered ineffective assistance at the sentencing phase by failing to conduct any investigation into mitigating evidence. Because Hawkins is unable to establish that he was prejudiced as a result of this lack of investigation, we reverse the district court's judgment.

### A. Standard of Review

Hawkins first raised this claim on direct review to the Supreme Court of Ohio. The court denied relief on this, as well as another, ineffective assistance claim, on both procedural and substantive grounds:

> [Hawkins] failed to raise these arguments before the court of appeals and, thus, appellant's claims of ineffective assistance of counsel have been waived. However, even if appellant's arguments are considered on the merits, appellant has failed to satisfy his burden of establishing ineffective assistance under the standards set forth

in [*Strickland v. Washington*, 466 U.S. 668 (1984)].   Accordingly, we reject appellant's [ineffective assistance claims].

*State v. Hawkins*, 612 N.E.2d 1227, 1234 (Ohio 1993).  Because the court addressed — albeit summarily — the merits of the issue, and because the State does not argue that the claim was procedurally defaulted, we will treat the state court judgment as an "adjudication on the merits" such that AEDPA's § 2254(d) applies.  *See Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir. 2002) (en banc) (per curiam) (defining "adjudication on the merits" to be a substantive, rather than a procedural, decision); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (an "adjudication on the merits" is a substantive, rather than a procedural, resolution of a federal claim).  In light of the cursory nature of the state court's reasoning on the issue, however, we will apply our modified AEDPA deference. *Vasquez*, 496 F.3d at 569 (applying modified standard where state court disposed of claim "with little analysis on the substantive constitutional issue"); *Howard*, 405 F.3d at 468 (applying modified standard where "state court has not articulated its reasoning for rejecting a constitutional claim"). Thus, we will conduct an independent review of the record and applicable law, but will grant relief only if the result of the decision by the Ohio courts to deny Hawkins relief on this ground was necessarily contrary to or amounted to an unreasonable application of clearly established Federal law.

In reaching this conclusion, we are mindful that the Supreme Court recently granted a writ of certiorari to determine whether AEDPA deference should apply where a state court resolved an issue without the benefit of evidence that was later received for the first time in a federal evidentiary hearing.  *Bell v. Kelly*, 128 S. Ct. 2108 (2008).  The issue in *Bell v. Kelly* is pertinent to Hawkins's case because evidence regarding the choice of Hawkins's counsel to forgo any investigation was never developed in the state courts and was produced for the first time in a federal evidentiary hearing.  Nevertheless, the result we reach in this case does not depend on the way in which the Supreme Court may resolve *Bell v. Kelly*, because we would reach the same result in this case even on de novo review.

## B.  Analysis

Hawkins claims that his constitutional rights were violated by trial counsel's failure to investigate and prepare adequately for the mitigation phase of his trial.  To establish constitutionally ineffective assistance of counsel, Hawkins must show (1) that his counsel rendered deficient performance, and (2) that this deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To establish deficient performance and satisfy the first prong of *Strickland*, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  The Supreme Court has articulated the following principles for examining attempts by counsel to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins v. Smith*, 539 U.S. 510, 521-22 (2003) (quoting *Strickland*, 466 U.S. at 690-91).[1]  This circuit has recognized that a complete failure to make an independent investigation of mitigating evidence will not often be reasonable.  *See Carter v. Bell*, 218 F.3d 581, 595-96 (6th Cir. 2000).  However, a careful reading of *Wiggins* reveals that counsel's performance will not necessarily be deficient because of a failure to investigate, so long as counsel's decision not to investigate is reasonable under the circumstance.  *Wiggins*, 539 U.S. at 521-22 ("counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary" (emphasis added)).

In this case, *Strickland*'s first prong turns on whether Hawkins's trial counsel made a reasonable decision that made mitigation investigations unnecessary.  At the evidentiary hearing, Hawkins's trial counsel testified to the following:

> In my judgment, this was not a mitigation case.  If the jury comes back and finds him guilty of two executions, there's not much we can tell them that's going to change their mind with regard to the ultimate verdict.  So this was not a case we thought about mitigation.

Instead, counsel opted for a strategy of residual doubt, whereby he continued to highlight the weaknesses in the State's case.  Notably, at that time, residual doubt was a strategy endorsed by both the Ohio and United States Supreme Courts.  *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. Ohio 2000) (citing *Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (recognizing the strategy as "an extremely effective argument for defendants in capital cases" (citation omitted)); *State v. Johnson*, 494 N.E.2d 1061, 1065 (Ohio 1986) ("omission of [mitigating] evidence in an appropriate case could be . . . the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively")).  Here, Hawkins's counsel may not have been reasonable in concluding that this was "not a mitigation case" without *any* knowledge of what type of mitigating evidence might exist.  But because Hawkins's claim ultimately fails the second prong of *Strickland*, we need not decide whether Hawkins's counsel's performance was deficient under the first prong of *Strickland*.

The second prong of *Strickland* requires Hawkins to show that his trial counsel's deficient performance prejudiced him by rendering the trial unfair and its result unreliable.  *Strickland*, 466 U.S. at 687.  To do this, Hawkins "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Slaughter*, 450 F.3d at 234 (quoting *Strickland*, 466 U.S. at 686).

There is no dearth of cases from this circuit and the Supreme Court in which counsel's failure to investigate mitigating evidence has been found to have prejudiced a capital defendant.  *See, e.g., Wiggins*, 539 U.S. at 535 (investigation would have shown a troubled history that included severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother, physical torment, sexual molestation, repeated rape during subsequent years in foster care, a period of homelessness, and diminished mental capacities); *Haliym v. Mitchell*, 492 F.3d 680, 718 (6th Cir. 2007) (investigation would have shown a home life that was "saturated with violence," frequently directed at petitioner by his father; during teen years a loss of father, mother, and brother within months of each other, and shortly thereafter, drug addiction; severe depression that led to a self-inflicted gunshot wound to the head, causing brain damage and impairment that was expected to demonstrate "greater than normal difficulties with impulsivity, judgment, and problem

---

[1]It is of no consequence that *Wiggins* was decided after Hawkins's conviction, as *Wiggins* made clear that it merely applied *Strickland* and did not make any new law.  *Slaughter*, 450 F.3d at 233 n.2 (citing *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003)).

solving"); *Williams v. Anderson*, 460 F.3d 789, 804-05 (6th Cir. 2006) (investigation would have shown that petitioner's alcoholic mother frequently hit him; that his father left when he was young; that his uncle and role model was a career criminal; that he was dependent on cocaine at time of crime, and the drug induced paranoid fears; and that he suffered from dyssocial reaction, mixed personality disorder with anti-social and narcissistic features); *Dickerson v. Bagley*, 453 F.3d 690, 698-99 (6th Cir. 2006) (investigation would have shown petitioner was borderline retarded; raised in a home where he was surrounded by "pimps, prostitutes and drug dealers"); *Harries v. Bell*, 417 F.3d 631, 639-40 (6th Cir. 2005) (investigation would have shown evidence of traumatic childhood; physical abuse; brain damage; mental illness; and exposure to extreme violence, including beatings of his mother, the rape of his sister, and the murder of both his father and stepfather); *Coleman v. Mitchell*, 268 F.3d 417, 450-52 (6th Cir. 2001) (investigation would have shown that petitioner was abandoned by his mother and raised by his grandmother, who abused him physically and psychologically, neglected him while running her home as a brothel and gambling house, involved him in her voodoo practice, and exposed him to group sex, bestiality, and pedophilia); *Skaggs v. Parker*, 235 F.3d 261, 269-75 (6th Cir. 2000) (post-conviction evidence indicated that petitioner was mentally retarded, suffered from organic brain damage, and exhibited psychotic, paranoid, and schizophrenic features); *Carter v. Bell*, 218 F.3d 581, 593-600 (6th Cir. 2000) (investigation would have shown petitioner's poor, violent, and unstable childhood; adult head injuries; psychotic problems; and positive relationships with his step-children, family, and friends).

Nevertheless, such a finding of prejudice is not made lightly, especially where the petitioner was not a victim of abuse and did not suffer from any mental disorders or difficulties. *See, e.g., Durr v. Mitchell*, 487 F.3d 423, 436 (6th Cir. 2007) (holding that the additional mitigating evidence of stable home and personal life was cumulative and not sufficient to establish prejudice); *Foley v. Parker*, 488 F.3d 377, 383 (6th Cir. 2007) (in finding no prejudice, noting that petitioner did not "come forward with evidence of a difficult childhood or mental problems"); *Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) (there was no prejudice where affidavits of family members "describe a relatively stable, although imperfect, family environment"; notably, although petitioner had an alcoholic father who may have physically abused petitioner's mother, there were "no allegations of physical or sexual abuse of [petitioner]").

In his attempt to establish prejudice in this case, Hawkins points to affidavits submitted by nine of his family members during state post-conviction proceedings. These affidavits disclosed that Hawkins's family members would have been willing and able to testify to the following mitigation-related items:

- Hawkins' biological father had a history of alcohol use. (Belle Green aff; Renee Rodgers aff.; Doris Hull aff; Kevin Hawkins aff.; Stephanie Hawkins Harris aff.; Judy Hogan aff.)

- There was discord in the Hawkins' parents' marriage, his father engaged in extramarital affairs, and his parents eventually divorced. (Belle Green aff.; Renee Rodgers aff.; Kevin Hawkins aff.; Stephanie Hawkins Harris aff.; Judy Hogan aff.; James Hawkins aff.)

- Hawkins' father physically assaulted his mother on one occasion breaking her nose. (Kevin Hawkins aff.; James Hawkins aff.)

- Hawkins was impacted by favoritism shown to his brother at school and at home. (Charles Hogan aff.)

-       Hawkins' sister died at the age of three and Hawkins appeared depressed afterwards. (Merinda Mae Walker aff.; Doris Hull aff.; Kevin Hawkins aff.; Stephanie Hawkins Harris aff.; Judy Hogan aff.; James Hawkins' aff.)

-       Hawkins appeared to be depressed and tried at least twice to commit suicide at a young age. (Belle Green aff.; Kevin Hawkins aff.; James Hawkins aff.)

-       Hawkins refused to take a plea bargain in this case stating that he would not plead to a crime he did not commit. (Charles Hogan aff.)

*Hawkins*, 2005 U.S. Dist. LEXIS 35538, at *158-59. The district court held that this was sufficient to establish prejudice, stating only that there "is a reasonable probability that at least one juror would have found Hawkins to be less morally culpable in some way based on the fact that he had a troubled upbringing marked by depression and two attempts at suicide." *Id.* at *165-66. We conclude that the district court erred.

These affidavits describe a markedly less traumatic and abusive childhood and adolescence than the circumstances of capital defendants in whose cases we have found the failure to investigate was prejudicial. While the alleged suicide attempts make this a somewhat closer case, the affidavits do not demonstrate that Hawkins was the victim of any physical or sexual abuse, and the only instance of violence they describe is an incident in which his mother's nose was broken as a result of her being pushed by his father. *See Carter*, 443 F.3d at 531 (no prejudice where affidavits of family members "describe a relatively stable, although imperfect, family environment"; although petitioner had an alcoholic father who may have physically abused his mother, there were "no allegations of physical or sexual abuse of [petitioner]"). Furthermore, and once again in stark contrast to those cases finding prejudice, this record does not indicate that Hawkins suffers from any serious mental or psychological problems. At most, the claimed suicide attempts point to some kind of mental instability, such as depression, but this is far different from the type of mental and psychological impairments suffered by defendants in the cases where we have found prejudice. *See, e.g., Skaggs*, 235 F.3d at 269-75 (post-conviction evidence indicated that petitioner was mildly mentally retarded, suffered from organic brain damage, and exhibited psychotic, paranoid, and schizophrenic features). We conclude that these affidavits are insufficient to establish prejudice under *Strickland*, and the result reached by the Ohio courts — the denial of Hawkins's claim of ineffective assistance of counsel — was neither contrary to nor an unreasonable application of clearly established Federal law. Indeed, we would find that result correct even under a de novo review. Accordingly, we reverse the district court's granting of habeas relief on this ground.

## IV.  PROSECUTORIAL MISCONDUCT

In the Third and Eleventh claims of his habeas petition, Hawkins contends that the prosecutor violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by withholding information about witnesses, by cross-examining a witness with false assumptions, by presenting perjured testimony, and by negatively characterizing witness testimony. All courts to address these claims, including the state courts on direct review and the district court below, have found them unavailing. We agree.

### A.  Explanation of Claims

Hawkins's Third Claim for Relief involves his alleged jailhouse confession to a fellow inmate, Keith Miree. The State ultimately chose not to place Miree on the witness stand due to concerns about his credibility: Miree was caught on tape attempting to extort money from Hawkins's father for favorable testimony regarding Hawkins. The State did, however, cross-examine Hawkins regarding the alleged confession:

Q.  Now, did you have an occasion to be – when you were locked up did you have an occasion to have a conversation with an individual by the name of Keith Miree?

A.  Yes.

Q.  And did you talk to him about this incident?

A.  No, sir.

Q.  You didn't talk to him about this at all?

A.  I talked to him about my indictment, about not getting an indictment.

Q.  Did you have an occasion to tell him you, in fact, killed these boys[.]  It wasn't about drugs, it was about money?

A.  No, sir.

Q.  You didn't tell him that?

A.  No, sir.

Q.  Did you have an occasion to tell Keith Miree you should have killed that young boy too?

A.  No, sir.

Q.  Never told him that?

A.  No, sir.

*See Hawkins*, 612 N.E.2d at 1233 (Ohio 1993).  Hawkins's counsel objected, and in a sidebar discussion in the judge's chambers, the prosecutor admitted that he probably would not call Miree as a witness.  After further discussion on the matter, the court admonished the jury to disregard the Keith Miree questioning:

> . . . [T]he prosecutor had asked Mr. Hawkins, the witness and defendant, two questions regarding conversations or a conversation, if you will, with a person named Keith Miree.
> . . . .
>         The Court at this time is instructing you that you are to disregard the two questions asked by Mr. Krumpelbeck of Mr. Hawkins regarding the discussion between – alleged discussion between defendant and Mr. Miree.
>         You're to disregard both the questions of the prosecutor and the two answers given by the defendant.

Hawkins argues that despite the trial court's strike and curative instruction, the prosecution's reference to the alleged confession during cross-examination of Hawkins violated Hawkins's constitutional rights; and the State improperly used Miree to elicit this alleged jailhouse confession.

In his Eleventh Claim for Relief, Hawkins alleges a number of incidents of prosecutorial misconduct and argues that the cumulative effect of these incidents entitled him to a mistrial. Hawkins claims that the State withheld the names of witnesses who could have contradicted Henry Brown's alibi; that the State misplaced files concerning Brown; that (essentially reiterating the Third

claim for habeas relief) the prosecutor, even though he did not expect to call Keith Miree as a witness, asked Hawkins in cross-examination whether he had confessed to Miree; that the prosecutor called one defense witness's testimony "incredible" and another's "ridiculous"; that the prosecution suborned perjury by allowing Shawn Brown to testify that, in the spring of 1989, Hawkins had showed her a gun that matched a gun box belonging to Hawkins, when in fact Hawkins's gun had been in police custody since 1988; that the prosecutor misrepresented testimony by arguing that Kenneth Boehmler identified Hawkins as the man he saw in the victims' car the night of the killing; and that the prosecutor improperly commented on the defense's failure to present an expert witness to testify about the bloody fingerprint found on a notebook in the victims' car.

### B. Analysis

In an evaluation of alleged prosecutorial misconduct the "correct inquiry is whether the improper comments or actions 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Slagle v. Bagley*, 457 F.3d 501, 515 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The Supreme Court of Ohio reviewed Hawkins's allegations and concluded that

> the conduct of a prosecutor during trial cannot be made a ground of error unless the conduct deprives defendant of a fair trial. Here, we find no cause to seriously question the fairness of appellant's trial or the integrity of the trial court's findings. The instances of prosecutorial misconduct, viewed singly or together, did not entitle him to a declaration of a mistrial.

*Hawkins*, 612 N.E.2d at 1234 (internal quotations omitted). We employ a two-part test to determine whether the Supreme Court of Ohio reasonably applied the federal standard in holding that prosecutorial misconduct did not render Hawkins's trial fundamentally unfair:

> First, we determine whether the prosecution's conduct was improper. If the answer is affirmative, then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Slagle*, 457 F.3d at 515-16. We have recognized that "the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Id.* at 516 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).

We agree with the district court that the Ohio courts' refusal to grant a mistrial on Hawkins's Third claim was not contrary to or an unreasonable application of clearly established Federal law. Even if — as Hawkins complains — the prosecution violated Hawkins's Confrontation Clause rights by cross-examining him regarding his alleged confession to Miree, the error was harmless. Any impact from that cross-examination was blunted immediately by the trial judge's instructing the jury to disregard the questions regarding Miree. Furthermore, it is unlikely that the jury was influenced by the improper questions because it never heard any further evidence to corroborate the implication that such a confession took place, and the overall case establishing Hawkins's guilt was strong. *Hawkins*, 2005 U.S. Dist. LEXIS 35538, at *64-65. And the district court properly found that because he "point[ed] to no facts in the record to demonstrate[] that Miree took steps beyond mere listening to deliberately elicit incriminating remarks from Hawkins," Hawkins had not established that the State had improperly used Miree as the State's agent, and had therefore failed to demonstrate

a violation of his Sixth Amendment right to counsel under *Kuhlmann v. Wilson*, 477 U.S. 436 (1986). *Hawkins*, 2005 U.S. Dist. LEXIS 35538, at *86.

The district court also correctly rejected Hawkins's Eleventh Claim, containing several instances of alleged prosecutorial misconduct. First, with regard to witnesses who — Hawkins claims — could have contradicted the testimony of Henry Brown, it was not objectively unreasonable for the state courts to determine that, even if the State had given Hawkins the names of those individuals, their testimony would not have been sufficient to undermine Henry Brown's testimony and Hawkins's conviction. Although the proposed testimony would have contradicted some of Brown's testimony, it would not have proved that Brown did not return to the scene of the murders before they took place; nor would it have undermined the forensic evidence against Hawkins or otherwise shown "that Hawkins was not at the scene of the crime or a participant in the murders." *Id.* at *59. The second instance involves the prosecution's cross-examination of Hawkins regarding Miree, and, as we have already explained, any error resulting from that cross-examination was harmless. *See id.* at *60-65. Next, Hawkins claims that the prosecution's characterizing one witness's testimony as "ridiculous" and another's as "incredible" entitled him to a mistrial. The district court correctly concluded that no mistrial was warranted: the statements were isolated, and the trial court took appropriate action to prevent any prejudice as a result of them. *Id.* at *65-67. Nor did the prosecution mischaracterize the testimony of Kenneth Boehmler, as Hawkins claims. Boehmler testified that he heard shots, and saw a man fitting Hawkins's description getting out of a parked "silverish-gray" colored car. During closing argument, the prosecutor said that Boehmler "describes the man involved in the killing and puts defendant in that car" and that "if that description didn't fit the defendant I never heard a better one." The trial court admonished the jury that closing arguments did not constitute evidence. We agree with the district court that it was not objectively unreasonable for the Ohio courts to determine that these statements did not render the trial fundamentally unfair. *Id.* at *67-69. The fifth of these instances — Hawkins's claim that the prosecutor insinuated during closing argument that Hawkins had some duty to call an expert to refute the State's bloody fingerprint evidence — was also correctly found to be meritless by the district court. The Ohio courts had all held that the trial court took appropriate action to correct the prosecutor's insinuation, the prosecutor's statement was isolated, it was not deliberate, and the trial court not only gave an appropriate curative instruction, but it also shortly thereafter reiterated the presumption of innocence and appropriate burdens in criminal cases, and therefore, no constitutional error occurred. *Id.* at *69-71. The district court correctly concluded that the judgment of the Ohio courts was neither contrary to nor an unreasonable application of clearly established federal law.

Finally, Hawkins's Eleventh Claim includes the allegation that the State suborned perjury when Shawn Brown was permitted to testify that she had seen Hawkins in May of 1989 with a gun that matched the gun box recovered from Hawkins's house by police in June of 1989. This was impossible, Hawkins argues, because on October 17, 1988, the police had seized from Hawkins's home the gun matching that gun box, and that gun was actually in police custody in May of 1989. Hawkins contends that this testimony misled the jury into believing that the gun box, which was unquestionably recovered from Hawkins's home, was related to the murder weapon. Although a juror might have mistakenly thought that Shawn Brown testimony meant that she had seen Hawkins with the gun originally stored in the gun box, it was made clear at other times during the trial that the gun box was *not* related to the murder weapon. Rather, the gun box was offered merely to show that the .25 caliber was Hawkins's "weapon of choice." The prosecution made this clear a number of times, including during its opening and closing statements. *Id.* at *114-17. In light of this record, the Supreme Court of Ohio held that Hawkins's claim of subornation of perjury is "not adequately supported by the record." Our review of the record confirms that this determination cannot be said to be "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2).

After carefully reviewing Hawkins's claims of prosecutorial misconduct, both individually and cumulatively, we conclude that the district court did not err in holding that the Ohio courts' decisions finding these claims meritless neither resulted in a judgment that is contrary to or an unreasonable application of clearly established federal law, nor a judgment based on an unreasonable determination of the evidence.

## V. *BRADY* VIOLATIONS

Claims Four and Seven of Hawkins's habeas petition advance arguments alleging that the prosecution withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). All courts to address these claims have found them unavailing, and we agree.

### A. Explanation of Claims

At trial, the prosecution presented evidence that two of Hawkins's fingerprints — one of which was in blood — were found in the victims' car. In Claim Four of his habeas petition, Hawkins argues that the prosecution failed to disclose certain allegedly material and exculpatory information regarding this evidence: that another forensic agency tried and failed to lift the print in blood; that there was a break in the chain of custody of the print in blood; that the print in blood was destroyed or distorted by the multiple attempts to lift it; that the evidence regarding the number of identifiable points on the print in blood and the print in the door was inconsistent; and there was other evidence that calls into question the reliability of all of the prints, including the destruction of two other partial latent prints on the notebook.

In his Seventh Claim for Relief, Hawkins argues that the prosecution failed to provide material and exculpatory evidence. The district court granted a COA on only two aspects of this argument. The first deals with information concerning Henry Brown, including: that Henry Brown had confessed to being involved in killing the victims; that Brown was fingerprinted and photographed six days prior to his being arrested for complicity in the killings; that an assault charge against Brown was dropped at the request of the State; that one of Brown's many conflicting versions of his story placed him with Tommicka Washington for four to five hours, which included the time of the killing, but this was contradicted by Washington; and that in a statement to the police Shawn Brown (a sister and alibi of Henry's) said that she heard shots after 11:30 p.m., while at trial she testified she heard shots sometime after 12:35 or 1:00 a.m. The second aspect of this claim for which the district court granted a COA alleges that the prosecution suppressed information that the police and prosecutor knew before trial that the police, not Hawkins, were in possession of the .25 caliber pistol from the gun box referred to at trial. Hawkins alleges that keeping this information from the jury gave them the materially false impression that Hawkins's gun box was tied to the murder weapon.

### B. Analysis

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court has since made it clear that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (quoting *Bagley*, 473 U.S. at 682); that "the duty to disclose such evidence is applicable even though there has been no request by the accused," *Strickler*, 527 U.S. at 280 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)); and that the duty encompasses "impeachment evidence as well as exculpatory evidence," *Strickler*, 527 U.S at 280 (citing *United States v. Bagley*, 473 U.S. 667, 676

(1985)), and evidence "known only to police investigators and not to the prosecutor." *Strickler*, 527 U.S. at 280-81.

As the district court correctly noted, Hawkins never raised his Fourth Claim in the Ohio Courts. The magistrate characterized this as a procedural default, *Hawkins v. Coyle*, 2004 U.S. Dist. LEXIS 28944, at *99 (S.D. Oh. Mar. 22, 2004), while the district court held it was a failure to exhaust, *Hawkins*, 2005 U.S. Dist. LEXIS 35538, at *97. However, both the magistrate and the district court denied the claim on its merits. On appeal, the State of Ohio does not make any arguments concerning procedural default or exhaustion, instead arguing that the claim's merits are unavailing. Because we agree that Hawkins's Fourth Claim is clearly without merit, we will simply rule on that basis without resolving the procedural issue. First, the district court's finding that there was no break in the chain of custody is not clearly erroneous. *Id.* at *100. Second, although the crime scene investigator's testimony during the habeas proceeding described techniques used to develop the print that were different from and in addition to those he testified to at trial, the failure to disclose this information was not a *Brady* violation because it did not impeach or contradict the trial testimony identifying the fingerprints. *Id.* at *101-04. Third, notwithstanding the discrepancies in the State's records regarding the number of identifiable points on the prints, all records indicated a number of identifiable points above that which is necessary to find an accurate match, and therefore the minor discrepancies were not material. *Id.* at *104-05.

Turning to the subclaims of Hawkins's Seventh Claim for habeas relief as to which the district court granted a COA, we conclude that the district court correctly held that Hawkins had failed to demonstrate any *Brady* violation. The district court held that Hawkins had failed to make any showing that the information about Henry Brown and the statements made by him contained exculpatory information, and therefore Hawkins had not demonstrated any *Brady* claim with regard to them. Acknowledging that Hawkins's burden with regard to Brown's alleged statements is made more difficult because Brown's file is now missing from the prosecutor's office, the district court held that Hawkins had not made the showing of bad faith on the part of the State in failing to preserve the file that is necessary to establish a due process violation. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Further, the district court held that at trial Brown's credibility had been subject to extensive attack through cross-examination, and that the withheld statements were not material because they were cumulative. *Hawkins*, 2005 U.S. Dist. LEXIS 35538, at *117-19.

Finally, the district court correctly held that the State had not committed any *Brady* violation with regard to the testimony about the gun box: Hawkins had personal knowledge that the police had seized the .25 caliber gun matching that gun box in 1988, months before the murders for which Hawkins was on trial. The district court went on to hold, again correctly, that the State had neither suppressed material evidence nor in any way violated Hawkins's constitutional rights in regard to the gun box.

## VI. REFUSAL TO DISCLOSE JUVENILE RECORDS

In his Twenty-Seventh Claim for Relief, Hawkins argues that he was denied his constitutional rights because he was not allowed access to Henry Brown's juvenile records for the purposes of impeachment. After conducting an *in camera* review of Brown's juvenile records, the state trial court determined that the information contained in these records either was already known to defense counsel or would not assist Hawkins in the preparation of his case. *Id.* at *50. The trial court refused to order the release of the records or to seal and append them to the trial record as an appellate exhibit. *Hawkins*, 612 N.E.2d at 1233. Hawkins argues in this appeal that, as a result, he was denied his confrontation, due process, and equal protection rights, along with his rights to present a defense and to receive effective assistance of counsel.

We agree with the reasoning of the district court in concluding that Hawkins did not suffer any violation of his Confrontation Clause rights. The district court found that notwithstanding the undisclosed juvenile records, Hawkins's jury was presented with information that Henry Brown had originally been charged for involvement in the murders and was being held in police custody at the time of trial, was receiving an immunity deal in exchange for his testimony, had made a number of inconsistent statements about the events surrounding the murders, and had been involved with drugs. *Hawkins*, 2005 U.S. Dist. LEXIS 35538, at \*55-56. The court concluded that Brown's juvenile records did not contain any new and material information, and therefore, the nondisclosure of those records did not violate Hawkins's constitutional rights.

Hawkins's due process and equal protection arguments fare no better, because he has done little, if anything, to advance these arguments at any point in this litigation. There is no indication in the record that Hawkins ever made any constitutional argument to the state trial court regarding Brown's juvenile records. In fact, as noted by the Supreme Court of Ohio, "[Hawkins]'s counsel candidly admitted at trial that his request for Brown's juvenile court records was nothing more than a fishing expedition . . . ." 612 N.E.2d at 1233. On direct appeal to the Supreme Court of Ohio, Hawkins at least nominally advanced the due process argument, but he failed to provide any legal support for it and the court denied the claim on the grounds that Hawkins "failed to make a threshold showing, supported by *any legal authority*, that he had any right to obtain the juvenile court records in the first instance." 612 N.E.2d at 1233 (emphasis added). Moreover, there is no record of Hawkins' ever having made any equal protection argument to the Ohio courts. Finally, even on appeal to this court, Hawkins altogether fails to articulate how his due process or equal protection rights might have been violated, and he certainly does not provide any case law on point. Because we can conceive of no way in which either of these rights were violated, we find no merit to Hawkins's claims.

## VII. CONCLUSION

Accordingly, we **REVERSE** the judgment of the district court granting Hawkins a writ of habeas corpus on his Second Ground for Relief, and **AFFIRM** the judgment of the district court denying habeas relief on all other grounds.