NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0669n.06

Nos. 06-2650/07-1221

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Oct 2, 2009

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| VINCENT CARTER, | ) | |
| | ) | **ON APPEAL** FROM THE |
| Petitioner-Appellee/Cross-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| HUGH WOLFENBARGER, WARDEN, | ) | **O P I N I O N** |
| | ) | |
| Respondent-Appellant/Cross-Appellee. | ) | |

BEFORE: BATCHELDER, Chief Judge, NORRIS and ROGERS, Circuit Judges.

**ALAN E. NORRIS, Circuit Judge.** Warden Hugh Wolfenbarger appeals the district court's grant of a writ of habeas corpus, 28 U.S.C. § 2254, to Vincent Carter. A jury convicted Carter of felony murder after a trial in a Michigan state court and he was sentenced to life in prison. However, the district court concluded that petitioner had received ineffective assistance of counsel when his trial attorney failed to object to the court's denial of the jury's request, made during deliberations, to review a transcript of portions of the trial testimony. To remedy that perceived violation, the district court issued a conditional writ of habeas corpus allowing the State ninety days to either commence a retrial or release petitioner from custody. For the reasons outlined in this opinion, we conclude that Carter is not entitled to relief, and vacate the writ.

**I.**

The district court summarized the undisputed facts of this case as follows:

This case arises out of the homicide of Hani Naemi. On March 20, 1992, Nidhal Jarbo and her brother-in-law, Hani Naemi, were working at their family store, the Eight Mile Express, in Detroit Michigan. Petitioner was a regular customer of the store. On that particular day, he came into the store, talked to Mr. Naemi, and then left. As Ms. Jarbo left the store to go to the bank, she saw Petitioner standing outside the store with what appeared to be a gym bag. When she returned to the store about fifteen or twenty minutes later, the police were present; Mr. Naemi had been shot. Once inside the store, Ms. Jarbo noticed that the money tray was missing from the store. The store safe was open when she left to go to the bank. Ms. Jarbo told the police that she had seen Petitioner standing outside the store. She knew Petitioner's girlfriend's name, as they both belonged to the store's video club. Ms. Jarbo located the video club card with Petitioner's name and address on it and gave it to the police.

The police discovered that Petitioner was on parole at the time of the incident, that he was the last person Ms. Jarbo saw at the store before she went to the bank, and thus Petitioner became a suspect. Petitioner was taken into custody and questioned. However, because there was insufficient evidence to charge him with the crime, he was released. Shortly thereafter, Petitioner was imprisoned on an unrelated parole violation–his parole was revoked based upon his arrest as a suspect in the Naemi murder, despite the charges being dismissed. He was sent to the Muskegon Correctional Facility.

While imprisoned in the Muskegon Correctional Facility, Petitioner shared a cell with Norman Mackin ("Mackin"). It is alleged that Mackin, in an effort to obtain an early release, claimed that he was assaulted by several prisoners while housed with Petitioner in the same room. Mackin testified at trial that Petitioner divulged to him his role in an unsolved Detroit murder. Shortly afterwards, Mackin was roughed up by other prisoners.

Despite the statements made by Mackin to the police, Petitioner was granted parole from prison and remained free for approximately three years before he was arrested and charged in the instant case. It was the details provided by Mackin that eventually allowed the police to allegedly tie Petitioner to the murder of Mr. Naemi.

Trial in this case began on September 9, 1996. At trial, the prosecution presented eighteen witnesses, photographs, and a diagram of the location of the store, as well as a technician's report.

Jury deliberations began on September 11, 1996. About fifteen minutes after the jury began to deliberate, the trial court received a note requesting the testimony

of Officer Collins, Lieutenants Rice and Presley, and Norman Mackin.  Officer Collins, Lieutenants Rice and Presley, and Norman Mackin were the key witnesses in the case.  The trial court's response to the attorneys was as follows:

> Now, obviously what I will do when they come back is I will sit them down in the jury box and respond, as to Dale Collins' testimony, Mackin's testimony, Presley's testimony and Rice's testimony, as I indicated in the beginning, they are to rely on their collective memories, there's no testimony they can read from.

Neither the prosecution nor defense counsel had an objection to what the trial court was going to tell the jury.[1]

It is undisputed that there were no eyewitnesses presented by the prosecution specifically identifying Petitioner as the perpetrator of the crime.  The only evidence which remotely linked Petitioner to this crime was the testimony of Mackin, whose criminal history spanned over forty years and who claimed that Petitioner had confessed the crime to him.  In exchange for his testimony, Mackin sought numerous favors, from State Police officials, the Wayne County Sheriff Department, and the Wayne County Prosecutor's Office, ranging from immediate release from prison, special good-time reduction from his sentence, placement in the federal prison system, granting of a new trial for the conviction he was serving, and early parole. Mackin died in or about June 2000.

*Carter v. Wolfenbarger*, No. 04-CV-74564, 2006 WL 3446205, at *1-*2 (E.C. Mich. Nov. 27, 2006). (footnote omitted).

---

[1]The trial judge further informed counsel of her intention to instruct the jury that "the transcripts are not typed and will not be typed for some weeks and months to come.  They must rely on their collective memories." *People v. Carter*, 612 N.W.2d 144, 148 (Mich. 2000). She then asked counsel, "Any input, any–anything else?" Carter's attorney replied, "Satisfaction with that part of it, Judge." *Id.*

Ultimately, the court gave the jury the following instruction:

> With regard to the [request for trial transcripts of witness testimony], one of the things the court explained to you in the beginning, that the transcripts will not be typed for some weeks and months way into the future and you must listen very carefully because you must rely on your collective memories to resolve any issues with regard to that.
>
> So that is the court's response to your question.  You now may return to the jury room and resume your deliberations.

*Id.* (footnote omitted).

The jury convicted Carter of felony murder, armed robbery (which was later vacated), and possession of a firearm. He was sentenced to life imprisonment without parole on the murder charge, and two years on the felony firearm charge. The district court went on to describe the subsequent procedural history of this case:

> Petitioner appealed his convictions to the Michigan Court of Appeals raising three issues: (1) ineffective assistance of counsel; (2) insufficient evidence; and (3) abuse of discretion by the trial court in denying the jury's request for testimonial transcripts of four key trial witnesses.
>
> While his appeal was pending, on May 16, 1997, Petitioner filed a *pro per* motion for a new trial and/or evidentiary hearing with the trial court on the basis of ineffective assistance of trial counsel. After holding an evidentiary hearing on that motion, the trial court found that Petitioner's claim was without merit and denied the motion.
>
> Meanwhile, Petitioner filed with the Michigan Court of Appeals a motion to remand for the purpose of filing a motion for a new trial on the basis of newly discovered evidence. On June 29, 1998, the Court of Appeals denied that motion.
>
> On December 18, 1998, the Michigan Court of Appeals, in a unanimous decision, reversed and remanded Petitioner's convictions to the trial court for a new trial. The Court of Appeals did not find that Petitioner's due process rights were violated because he was denied the effective assistance of counsel or that there was insufficient evidence to sustain his convictions. Rather, it found that the trial court abused its discretion, in violation of M.C.R. 6.414(H), in denying the jury's request for testimonial transcripts of four key trial witnesses, specifically that of Norman Mackin, the inmate who resided with Petitioner while he was being held at the Muskegon Correctional Facility as a result of a parole violation.

*Id.* at *2-*3.(citation omitted).

The State appealed that decision to the Michigan Supreme Court, which reversed and reinstated Carter's original sentence. *People v. Carter*, 612 N.W.2d 144 (Mich. 2000). The prosecution conceded, and the Michigan Supreme Court agreed, that the trial court's jury instructions

violated MCR 6.414(H).[2] *Id.* at 148. The Court nonetheless reinstated Carter's sentence because

"[Carter] waived the issue when defense counsel expressed satisfaction with the trial court's refusal

of the jury's request and its subsequent instruction to the jury." *Id.* The majority explained:

> When asked by the trial court in the present case for a response to its proposed instructions, defense counsel expressed satisfaction with the trial court's decision to explain that the transcripts were not available and that the jury must rely on its collective memory. Because defense counsel approved the trial court's response, defendant has waived this issue on appeal.
>
> . . . .
>
> . . . Defense counsel in the present case did not *fail to object*. Rather, counsel *expressly approved* the trial court's response and subsequent instruction. This constitutes a waiver that *extinguishes* any error. Thus, this case does not concern unpreserved error where no timely objection was made.

*Id.* at 149-50 (footnote omitted). Justice Cavanagh dissented, arguing that this error "cannot be

waived." The majority responded, acknowledging that a defendant does have certain rights that

counsel may not waive without his express public consent. *Id.* at 150. However:

> A defendant does not have a right to have a jury rehear testimony. Rather, the decision whether to allow the jury to rehear testimony is discretionary and rests with the trial court. In our opinion, the decision whether to oppose the trial court's refusal of the jury's request for testimony is akin to an evidentiary decision. Because counsel has full authority to manage the conduct of the trial and to decide matters of trial strategy, we conclude that in this instance, waiver could be effected by the action

---

[2]That rule provides as follows:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence, the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may order the jury to deliberate further without the requested review, so long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

MCR 6.414(H) (subsequently redesignated subsection (J)). Neither party questions whether the trial court violated this rule, and so we will assume, without deciding, that it did.

of defense counsel.

*Id.* at 151 (citations and footnote omitted). This was the last reasoned state court opinion on the

waiver issue.

Thereafter Carter filed a motion for post-conviction relief in the trial court. In that motion

he raised several issues, two of which are relevant here: ineffective assistance of trial counsel for

failing to object to the trial judge's violation of MCR 6.414(H), and ineffective assistance of

appellate counsel for failing to raise that issue on direct appeal. Beginning with the ineffective

assistance of trial counsel claim, the court looked to *Strickland v. Washington*, 466 U.S. 668 (1984),

and rejected the claim in these terms:

> [D]efendant has not rebutted the presumption of effective assistance of counsel. The
> issues of ineffective assistance of counsel complained of by Defendant seem to be
> part of purposeful trial strategy, rather than counsel mistakes. This Court will not
> second-guess the strategies of trial counsel.

*People v. Carter*, No. 96-002619, at 10 ( Mich. 3d Cir. Ct. Crim. Div., May 21, 2002). The court

also addressed Carter's appellate ineffective assistance claim. It pointed out that "appellate counsel

need not raise all possible claims of error on appeal," restated the *Strickland* standard, and summarily

concluded "[d]efendant has not met this burden. On the basis of Defendant's assertions, this Court

will not second-guess the strategies appellate counsel employed." *Id.* at 12, 13.

Finally, Carter filed an application for leave to appeal that decision in the Michigan Court

of Appeals and the Michigan Supreme Court, but both were denied.

On November 16, 2004, Carter filed his petition for a writ of habeas corpus, and amended

the petition on April 27, 2005, asserting a total of eight grounds for relief. Before us now are three

of those claims, all of which arise from the trial court's violation of MCR 6.414(H): (1) trial court's

error was not subject to waiver by counsel; (2) trial counsel was ineffective for failing to object to

the trial court's error; and (3) appellate counsel was ineffective for failing to argue on appeal that

Carter's trial counsel was ineffective for failing to object. The district court extensively discussed

the first issue, but did not grant relief on that basis. However, the court agreed with Carter on both

of his latter two claims, and granted his petition.[3]

## II.

We review a district court's grant of habeas relief *de novo*. *Hereford v. Warren*, 536 F.3d

523, 527 (6th Cir. 2008). Carter filed his petition after the enactment of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, and so its

provisions govern. *Hawkins v. Coyle*, 547 F.3d 540, 545 (6th Cir. 2008). That statute requires us

to look to the last reasoned state court decision on the issue, including state post-conviction review.

*Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (reviewing a post-conviction opinion). We

accord great deference to the state court determination, and may grant relief only if the state

adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States," or was

based on an "unreasonable determination of the facts." 28 U.S.C. § 2254(d). "Clearly established

Federal law" refers only to the holdings of Supreme Court decisions extant at the time the state court

---

[3]Carter proceeded pro se in the district court, and when the government appealed that court's decision, he filed a cross-appeal in which he sought to challenge the district court's failure to grant him relief on the additional grounds raised in his appeal. Now represented by counsel, he has withdrawn his cross-appeal.

ruled on the issue. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citation omitted).

### III.

### A.

Although the district court did not reach the question of whether trial counsel could have waived his objection to the refusal to supply the jury with the transcripts it requested, this purely legal issue was fully briefed below and in this court. Carter relies on *United States v. Olano,* 507 U.S. 725 (1993), for the proposition that his counsel could not have waived his objection to the trial court's refusal to provide transcripts to the jury. He argues that, while there is no constitutional right to have a jury revisit testimony, the trial court's ruling infringed upon his general due process right to have a tribunal follow its own rules.

The Michigan Supreme Court, the last state court to issue a reasoned opinion on this issue, acknowledged that under *Olano* and other Supreme Court precedents, a defendant has certain rights that are not subject to waiver. *Carter*, 612 N.W.2d at 150. But the Court went on to determine that Carter's counsel had the authority to waive MCR 6.414(H) without consulting Carter. *Carter*, 612 N.W.2d at 151. In our view this conclusion is perfectly consistent with *Olano*. That case does not provide any guidance as to which rights are subject to waiver and which are not. Rather, we read it for the proposition that certain rights may be waived. *See Olano*, 507 U.S. at 733. The Michigan

Supreme Court's decision was therefore not contrary to or an unreasonable application of that decision.[4]

Nor does the Michigan Supreme Court's decision run afoul of any other United States Supreme Court precedent. In *New York v. Hill*, 528 U.S. 110 (2000), the Supreme Court noted that it has, "in the context of a broad array of constitutional and statutory provisions, articulated a general rule that presumes the availability of waiver," even when that waiver involves "the most basic rights of criminal defendants." *Id.* at 114 (quotations omitted). There are, of course, "certain fundamental rights" which are not subject to waiver *by counsel*, such as the right to counsel and the right not to plead guilty. *Id.* (citing *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938), and *Brookhart v. Janis*, 384 U.S. 1, 7-8 (1966)). But "the lawyer has–and must have–full authority to manage the conduct of the trial . . . . Thus, decisions by counsel are generally given effect as to what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence." *Id.* at 115 (citations and quotations omitted). The Michigan Supreme Court looked to *Hill* for guidance, and determined that "the decision whether to oppose the trial court's refusal of the jury's request for testimony is akin to an evidentiary decision," and therefore fell under counsel's "authority to manage the conduct of the trial and to decide matters of trial strategy." *Carter*, 612 N.W.2d at 151. Carter has not explained how this is contrary to or an unreasonable application of *Hill*, and we conclude that it is not. The decision whether to object in this instance did not involve

---

[4]Carter also suggests that relief is warranted because the Michigan Supreme Court distinguished between rights and rules, *Carter*, 612 N.W.2d at 151, and the United States Supreme Court draws no such distinction. However, we find Carter's argument on this point irrelevant; the Michigan Supreme Court's decision hinged on its conclusion that the error at issue here was waivable by counsel, *id.* at 151, so Carter's emphasis on the distinction (or lack thereof) between a rule and a right is misplaced.

Carter's fundamental rights. It was one of many minor tactical decisions counsel faced during trial, precisely the sort of decision that counsel had the "full authority" to make, as is clear under *Hill*. We therefore leave undisturbed the Michigan Supreme Court's determination that Carter's counsel could and did waive the error at issue here.

**B.**

As noted above, Carter asserts that he received ineffective assistance of counsel at two different stages of state court proceedings: at his trial ("trial IAC") and on direct appeal ("appellate IAC"). Although each of these claims represents a separate ground for relief, both ultimately depend on the strength of the trial IAC claim. This is because the appellate IAC claim is based entirely on appellate counsel's failure to raise the trial IAC claim. It is well established that appellate counsel is not ineffective for failing to raise every nonfrivolous argument. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Rather, "[i]f there is a reasonable probability that [the defendant] would have prevailed on appeal had the claim been raised, we can then consider whether the claim's merit was so compelling that appellate counsel's failure to raise it amounted to ineffective assistance of appellate counsel." *Valentine v. United States*, 488 F.3d 325, 338 (6th Cir. 2007) (quoting *McFarland v. Yukins*, 356 F.3d 688, 700 (6th Cir. 2004)) (alterations in original). In short, as goes Carter's trial IAC claim, so goes his appellate IAC claim.[5]

---

[5]The State argues that Carter's trial IAC claim is procedurally defaulted, but Carter responds that he has established cause and prejudice, which excuses his default. *Hartman v. Bagley*, 492 F.3d 347, 357 (6th Cir. 2007). We do not reach the issue of whether Carter procedurally defaulted on his trial IAC claim because we would still be required to reach the merits of this claim when addressing Carter's cause and prejudice argument. Carter attempts to show cause and prejudice through his appellate IAC claim which, as noted above, is based on an analysis of his trial IAC claim. Therefore, we skip straight to the merits of his trial IAC claim.

We turn, then, to the trial IAC claim.  The Michigan trial court, sitting in post-conviction review, issued the last reasoned state court opinion on this issue, and it rejected Carter's claim.  That court recited the *Strickland* standard, but provided only minimal analysis of that standard's application to this case.  We have noted that a cursory analysis affects the degree of deference we accord to a state court decision:

> Where the state court disposes of a Federal constitutional claim with little-to-no articulated analysis of the constitutional issue, this circuit applies a modified form of AEDPA deference.  This modified-AEDPA standard requires that we conduct a careful and independent review of the record and applicable law, but we cannot reverse unless the state court's decision is contrary to or an unreasonable application of federal law. In other words, in such cases, we must focus on the *result* of the state court's decision, applying AEDPA deference to the result reached not the reasoning used.

*Hawkins v. Coyle*, 547 F.3d 540, 546-47 (6th Cir. 2008) (citations omitted and punctuation altered).  It is that level of deference which we apply to the state court's resolution of Carter's IAC claims.

As an initial matter, neither party disputes-and therefore we do not address-the proposition that the trial court erred in its ruling on the witness transcripts.  The State argues that trial counsel's failure to object to this error was a strategic decision, as trial counsel realized that the jury's review of the testimony in question would have worked to Carter's detriment.  Carter, on the other hand, argues that such a decision could not have been reasonable trial strategy because the requested testimony was so beneficial to him.  The question before us is whether it was contrary to, or an unreasonable application of, clearly established Supreme Court precedent for the state trial court, on post-conviction review, to determine that the State was correct.

The jury requested to see transcripts of testimony of the four most central witnesses in the case, all of whom were offered by the prosecution: (1) Mackin, Carter's cellmate, to whom Carter allegedly confessed; (2) Officer Collins, the primary investigator in the Naemi murder; (3) Lt. Rice, who supervised and coordinated the homicide squad investigating the murder; and (4) Lt. Presley, who eventually took over that same homicide squad, and flew up to Mackin's detention facility and was the first to question Mackin about this case. The parties agree that the heart of this trial was Mackin's testimony; before he agreed to testify, the police had dropped Carter from being a suspect for lack of evidence. So it comes as no surprise that, throughout the trial, the general thrust of the prosecution's case was to persuade the jury of his credibility, primarily by attempting to show that Mackin could not have known what he knew about the murder unless Carter had told him, and Carter could not have known the things he told Mackin unless he committed the murder. These details included the facts that Naemi had been shot while he was in the cooler, that the convenience store was owned by people of Arab descent, that the murder had been committed with a shotgun, and that the murderer had waited for the other people to leave the convenience store before committing the robbery. Secondarily, the prosecution sought to demonstrate to the jury that Mackin was not testifying for personal gain.

Carter's defense, therefore, centered around casting doubt on Mackin's credibility by arguing that Mackin had concocted this story in an effort to obtain various favors from the police. Carter's theory was that Mackin first learned about the Naemi murder from files Carter kept in their cell, and then simply provided the information that he learned from them to the police in his initial interview. From that point on he was able to glean more and more information about the case from various

sources along his way. These sources included Carter himself, the police who interviewed Mackin, and even the victim's family (with whom Mackin eventually met during the three-year period between his initial interview with the police and Carter's trial). To substantiate this theory, the defense highlighted two inconsistencies in Mackin's testimony, the first of which was the fact that, during Mackin's initial interview with the police, he did not tell them that the murder weapon was a sawed-off shotgun, whereas he did testify to this fact at trial.[6] The defense focused on this in order to refute the prosecution's argument that Mackin could not have known this fact but for Carter's confession. Instead, the defense urged, Mackin had only learned this fact after he came forth, during one of his encounters with the authorities or the victim's family.

The second inconsistency the defense pointed to regarded the favors Mackin had requested from the police in exchange for testifying. At trial, Mackin repeatedly testified that, all along, he wanted little or nothing from the police except for the protection necessitated by his becoming a witness. But Lt. Presley made clear that at the initial interview Mackin had actually made numerous requests, including immediate release from prison.[7] Obviously this not only impeached Mackin's credibility by showing that what he said on the stand was not entirely true, but it bolstered the defense's substantive argument that Mackin was motivated to make up this story in exchange for favors from the police.

---

[6]Mackin claimed he withheld this information in hopes of using it later as a bargaining chip with the police.

[7]In exchange for testifying, Mackin ultimately received a transfer into federal custody, and a letter from the prosecutor to the judge who had sentenced Mackin in state court, requesting "good time" credits, which, as far as we can tell, would have reduced Mackin's sentence by a period of several months. At the time, Mackin was serving a sentence of eight to fifteen years.

But despite these points, the factual foundation in this case is ultimately too weak to support the theory that the defense attempted to build upon it. None of the police officers presented testimony that information about the murder could have leaked out to either Carter or anyone else in the penal system. They repeatedly stressed the opposite, and thorough probing by the defense revealed nothing to the contrary. Notwithstanding the dispute regarding the shotgun, the defense made no attempt to explain the other details Mackin knew about the murder–that the shooting occurred in a cooler, that the store owners were of Arab descent, or that the perpetrator had waited until the store emptied before taking action. These were all things that, according to police testimony, Mackin simply could not have known without Carter's confession. And although Mackin's testimony was weakened by the two inconsistencies discussed above, defense counsel did a thorough job of highlighting these weaknesses the first time around. Thus, the jury had an opportunity to consider the defense's theory, but rejected it. The question is whether the jury, upon reviewing the requested transcripts, would have found anything that it had missed the first time around that was particularly beneficial to petitioner. In our view it would not have found any such testimony. The jury simply would have realized that Carter's defense counsel had done a good job in closing arguments by making mountains out of two testimonial molehills.

The final problem with Carter's theory is that its key component is Mackin's ability to pull off such a complex scheme, in which he managed to trick the police and perhaps the victim's family into revealing information regarding the Naemi murder, in order to weave a false and self-serving story to present at trial. Throughout this process, Mackin also would have had to keep the police convinced that he knew much more about the murder than he actually did, so that he could string

- 14 -

them along and learn more about the murder. Having reviewed Mackin's testimony, we believe the jury reached the same conclusion that the state court did on post-conviction review, which is that Mackin was simply incapable of executing such a plan. His rambling and tangential style of answering questions, coupled with his tendency to continue speaking through objections and rulings by the judge, gave the impression of a person who was, to say the least, a bit flighty and distracted. This also made his testimony extremely difficult to follow, which provides a likely explanation for the jury's transcript request. The state trial court necessarily concluded that there was nothing buried in this testimony that was so beneficial to Carter that counsel's failure to object constituted ineffective assistance. In our view, that conclusion was not an unreasonable application of clearly established Supreme Court precedent.

As explained above, the conclusion that Carter's trial IAC claim is without merit also forecloses his appellate IAC claim, because the trial IAC claim would have been rejected had counsel raised it on direct appeal. *McFarland*, 356 F.3d at 700.

**IV.**

We therefore **reverse** the decision of the district court, **vacate** the writ, and **remand** for further proceedings.